**FISHER BROTHERS, on behalf of itself and all others similarly situated, Plaintiff,**

v.

**CAMBRIDGE–LEE INDUSTRIES, INC., Cerro Copper Products Co., Inc., Halstead Industries, Inc., and Howell Metals Company, Defendants,**

**and Related Actions.**

**Civ. A. No. 82–4921.**

United States District Court, E.D. Pennsylvania.

Oct. 2, 1985.

See also, D.C. 585 F.Supp. 69.

Seymour Kurland and Burt M. Rublin, Wolf, Block, Schorr & Solis-Cohen, Leonard Barrack, Barrack, Rodos & Bacine, Warren Rubin, Gross & Sklar, Philadelphia, Pa., for plaintiffs.

Barry Wm. Levine, Dickstein, Shapiro & Morin, Washington, D.C., for defendant.

Joseph A. Tate, Philadelphia, Pa., for Howell Metals.

Seymour I. Toll, Philadelphia, Pa., for Cambridge-Lee.

Barry Levine, Paul Taskier, Washington, D.C., for Mueller Brass Co.

Patrick T. Ryan, Lowell Sachnoff, Philadelphia, Pa., for Cerro Copper.

William M. Wycoff, Pittsburgh, Pa., for Halstead.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

Plaintiff Fisher Brothers brought this action individually and on behalf of a putative class of direct purchasers of copper water tubing against defendants Cambridge-Lee Industries, Inc. ("Cambridge-Lee"), Cerro Copper Products, Inc. ("Cerro"), Halstead Industries, Inc. ("Halstead"), and Howell Metals Company ("Howell"), for relief from defendants' alleged price-fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants Halstead and Howell settled with plaintiffs on April 23, 1984 and this court approved those settlements as fair, reasonable and adequate on February 5, 1985. Cambridge-Lee and Cerro signed settlement agreements with plaintiffs on January 10, 1985 and February 7, 1985, respectively. On September 9, 1985 a hearing was held on plaintiffs' motion to approve these settlements pursuant to Fed.R.Civ.P. 23(e) following due notice to members of the proposed settlement class. No class member objected or asked to be heard. Upon full consideration of written submissions and oral arguments in support of the settlements, the court approves these settlements as fair, reasonable and adequate.

## FACTS and PROCEDURAL HISTORY

A federal grand jury in the Eastern District of Pennsylvania began investigating alleged price-fixing in the copper water tubing industry in the summer of 1981. On November 5, 1982, while the investigation was in progress, Fisher Brothers filed a civil complaint on behalf of direct purchasers of copper water tubing against Cambridge-Lee, Cerro, Halstead, and Howell[1] that alleged defendants and other co-conspirators had engaged in a nationwide conspiracy to fix, raise, maintain or stabilize the price of copper water tubing, in violation of Section 1 of the Sherman Act. Plaintiffs also moved to certify the action as a class action. Shortly thereafter, a number of complaints with similar allegations were filed by other copper water tubing purchasers against these defendants.

On March 18, 1983, the grand jury returned an indictment against six corporate defendants, Cambridge-Lee, Cerro, Phelps Dodge Industries, Inc. ("Phelps Dodge"), Reading Industries, Inc. ("Reading"), Revere Copper and Brass, Inc. and Revere

---

1. The complaint also named five individual defendants, but they were later dismissed by consent of the parties.

Copper Products, Inc. (together known as the "Revere Companies") and six present or former employees of Cambridge-Lee, Cerro, and Revere. The indictment alleged that the corporate and individual defendants had engaged in an unlawful conspiracy to fix the prices of copper water tubing from at least 1975 until June, 1981.[2]

Subsequent to the indictment and prior to the criminal trial, the court in this action approved a stipulation deferring all but third-party discovery until the conclusion of the criminal trial and certifying a class defined as:

> All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their parents, subsidiaries and affiliates, and their alleged co-conspirators) who have, during the time period 1975 through November, 1982, purchased copper water tubing directly from one or more of the defendants (including defendants' subsidiaries and affiliates) or their alleged co-conspirators.

A nine-week criminal trial was held before The Honorable Daniel H. Huyett, 3rd, and on December 22, 1983 the jury found all defendants who went to trial not guilty.[3] Following conclusion of the criminal proceedings, the parties commenced discovery in this civil litigation. Plaintiffs negotiated settlements with Halstead and Howell during the Spring of 1984. The court preliminarily approved these settlements on October 29, 1984 and directed that notice of the proposed settlements be sent to the settlement class.[4] Recipients of the notice were told that they would be members of the class if at any time from January 1, 1975 through November 30, 1982 they had purchased copper water tubing directly from Cambridge-Lee, Cerro, Halstead, Howell, Phelps Dodge, Reading, the Revere Companies, or Mueller, unless they chose not to be by their affirmative action. The Halstead and Howell settlements were approved by this court as fair, reasonable, and adequate on February 5, 1985.[5]

Throughout 1984 and early 1985, plaintiffs were engaged in discovery and settlement discussions with Cambridge-Lee and Cerro. On a number of occasions this court actively intervened to assist the progress of the negotiations. On January 10, 1984, plaintiffs and Cambridge-Lee entered into a settlement agreement for $900,000, to be paid in six semi-annual installments of $150,000 with interest on the outstanding balance at the prime rate; final payment is to be made on or before July 1, 1987. The court heard argument on plaintiffs' motion for preliminary approval of this settlement on January 11, 1985 and granted preliminary approval on February 26, 1985. On February 7, 1985, plaintiffs and Cerro entered into a settlement agreement for $3,825,000. This sum was paid into an interest-bearing escrow account on February 13, 1985. Plaintiffs argued in support of preliminary approval of the set-

---

**2.** Subsequently, plaintiff individually and on behalf of a putative class of direct purchasers of copper water tubing brought actions against Phelps Dodge (Civil Action No. 83–2457), the Revere Companies (Civil Action No. 84–5106) (Bankruptcy Court for the Southern District of New York approved a stipulation allowing this suit solely for purposes of effectuating a settlement included in the stipulation), and Mueller Brass Company (Civil Action No. 84–0413), an unindicted co-conspirator. The court has approved settlements in all of these cases: the Revere Companies (January 24, 1985), Phelps Dodge (February 20, 1985), and Mueller (October 3, 1985). Reading was in bankruptcy proceedings in the United States Bankruptcy Court for the Eastern District of Pennsylvania; pursuant to an order of that court, virtually all of Reading's assets were sold to an unrelated entity. Since Reading was not an operating company and had no assets with which to respond to a judgment, plaintiffs could not pursue any claim against Reading in this litigation.

**3.** Prior to the criminal trial, Reading and the Revere Companies had entered pleas of *nolo contendere* and were sentenced accordingly.

**4.** At this time, the court also preliminarily approved and directed notice to the class of settlements with Phelps Dodge and the Revere Companies.

**5.** The court approved the Revere settlement on January 24, 1985, and the Phelps Dodge settlement on February 20, 1985. Only 46 entities opted to excluded themselves from the class; the names of these entities are listed on Exhibit A attached hereto.

tlement on March 29, 1985, and the court granted preliminary approval on May 17, 1985. Each of these settlements was on behalf of a stipulated class consisting of:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their subsidiaries and affiliates, and their alleged co-conspirators) who have, during the period January 1, 1975 through November 30, 1982 (hereafter referred to as 'the covered period'), purchased copper water tubing directly from one or more of the defendants (including defendants' subsidiaries and affiliates) or their alleged co-conspirators.

On May 17, 1985, the court directed that notice of the proposed settlements be sent to the settlement class [6] and published twice in all regional editions of *The Wall Street Journal.* Pursuant to the court's Order, counsel for the class sent notice informing all class members that a court hearing to determine whether the proposed Cambridge-Lee and Cerro settlements were fair, reasonable, and adequate would be held on September 9, 1985.[7] The notice stated that any member of the class could appear and be heard at the hearing to object to the settlements. Proof of mailing and publication of the notice was filed with the court on June 26, 1985 and supplemented by a status report filed with the court on September 4, 1985. The September 9, 1985 hearing was held as scheduled.

The court, having considered the oral submissions of September 9, 1985 and the prior filings and record of this case, now determines upon an independent evaluation of the proposed Cambridge-Lee and Cerro settlements that they are fair, reasonable and adequate.

## JURISDICTION TO APPROVE SETTLEMENT

At the September 9, 1985 hearing on approval of the Cambridge-Lee, Cerro and Mueller settlements the court ruled that the notice of appeal filed by Phelps Dodge on August 26, 1985 in *Fisher Brothers, et al. v. Phelps Dodge, Inc.* (Civil Action No. 83–2457) did not divest the court of jurisdiction to approve the Cambridge-Lee and Cerro settlements (Civil Action No. 82–4921) or the Mueller settlement (Civil Action No. 84–413). In its appeal, Phelps Dodge seeks to overturn this court's ruling of July 26, 1985 that the Cerro settlement did not violate the most favored nations clause of the Phelps Dodge settlement approved by this court on February 20, 1985. This determination was made before scheduling the September 9, 1985 hearing to determine whether the Cambridge-Lee, Cerro and Mueller settlements should be approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The Phelps Dodge appeal was taken after that hearing was scheduled.

As a general rule, the timely filing of a notice of appeal is an event of jurisdictional significance immediately conferring jurisdiction on a court of appeals and divesting a district court of its control over those aspects of the case involved in the appeal.

*Venen v. Sweet,* 758 F.2d 117, 120 (3d Cir.1985).

■ The appeal of Phelps Dodge, filed August 26, 1985 in Civil Action No. 83–2457, divested the district court of power to act further in regard to that case. It would particularly preclude an order approving distribution of the Phelps Dodge settlement fund even if distribution were not precluded by the terms of the settlement agreement itself. However, the joint class action against Phelps Dodge is separate from the class actions against Cambridge-Lee and Cerro which were consolidated in Civil Action No. 82–4921, the so-

---

6. This settlement class is the same as the settlement class agreed to in the Phelps Dodge, Halstead, Howell, and Revere settlements. Therefore, any class member who did not opt out of the class when notified of the prior settlements

is also a member of the Cambridge-Lee and Cerro settlement class.

7. This notice also informed class members of a proposed settlement with Mueller.

called Master File case. Like the action against Mueller, the Phelps Dodge case, while coordinated for discovery was never consolidated for trial or any other purpose. Phelps Dodge unlike the Master File claimants (but like Mueller), agreed to class certification for settlement purposes only; in other respects the Phelps Dodge action has been treated as separate and independent from the Master File cases and the Mueller case. Indeed, the very memorandum opinion from which the Phelps Dodge appeal was taken was filed in Civil Action No. 83–2457 only. Therefore, the pendency of the Phelps Dodge appeal does not divest the court of jurisdiction to approve the Cambridge-Lee, Cerro and Mueller settlements.

### APPROVAL OF SETTLEMENT

▆▆ Rule 23(e) of the Federal Rules of Civil Procedure mandates court approval of a class action settlement:

> A class action shall not be dismissed or compromised without the approval of the Court, and notice of the proposed dismissal or compromise shall be given to all members of the class . . . .

Approval of a proposed class action settlement is discretionary with the court. *Girsch v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975); *Ace Heating & Plumbing Company v. Crane Company,* 453 F.2d 30, 34 (3d Cir.1971). Settlement is a course favored by law, *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.,* 455 F.2d 770, 773 (2d Cir.1972), but a settlement will be approved only if it is "fair, adequate, and reasonable" to the members of the class, *Walsh v. Great Atlantic and Pacific Tea Company, Inc.,* 726 F.2d 956, 965 (3d Cir.1983). The settlement must be both substantively reasonable compared to the likely rewards of litigation, *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978), and the result of good faith, arms length negotiations, *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982).

Various courts have attempted to specify factors to be considered prior to decision upon the fair, reasonable, and adequate nature of a proposed class action settlement. *See Malchman v. Davis,* 706 F.2d 426, 433–34 (2d Cir.1983) (nine factors); *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) (six factors); *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 625 (9th Cir., 1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983) (eight factors). In *Girsch v. Jepson,* 521 F.2d 153 (3d Cir. 1975), the Court of Appeals for this Circuit noted the relevancy of the following nine factors in determining the fairness of a settlement:

> . . . (1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. . . .

*Girsch,* 561 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974) ).

### A. Uncertainties of Litigation

The settlements with Cambridge-Lee and Cerro were reached after the companion criminal trial and the bulk of the civil discovery. Plaintiffs' pretrial memorandum, filed on November 8, 1984 and supplemented on December 4, 1984, noted that, with the following exceptions, discovery was essentially completed: Plaintiffs needed to take some additional depositions; plaintiffs were waiting for defendants to supplement certain discovery responses; plaintiffs' experts were still analyzing the issues of liability and impact and computing potential monetary damages sustained by the class; if plaintiffs prevailed on their pending motion for production of grand jury

transcripts and obtained additional information relating to this litigation, more discovery might have been requested. Had settlements with Cambridge-Lee and Cerro not been achieved, the court was determined to try this case during the summer of 1985. Therefore, these settlements avoided some but not a great deal of discovery.

But settlement allowed plaintiffs to avoid the risks involved in continuing to litigate against these defendants. Cambridge-Lee, Cerro, and their indicted employees were all acquitted in the criminal trial. Some of defendants' customers at the criminal trial testified to strong competition in the copper water tubing industry during the alleged conspiratorial period. Additionally, experts at the criminal trial had testified that there was competition in the industry and that the industry as a whole was in a situation of declining profit. According to plaintiffs' co-lead counsel,

> [t]he criminal trial testimony of defendants' customers and expert witnesses gave rise to concern on the part of plaintiff's counsel that even if they could prove the existence of a conspiracy among the defendants, they might be unsuccessful in proving damages.

(Plaintiffs' Exhibit 1, 5/24/85 Hearing). Plaintiffs' evidence, while sufficient to go to a jury, depended on inference and circumstance; it did not include a strong or shocking item of evidence clearly demonstrating that the defendants had conspired to fix prices. (Plaintiffs' Exhibit 1, 5/24/85 Hearing). Many of those deposed had invoked their Fifth Amendment privilege so, for those witnesses, plaintiffs' civil testimony would be limited to reading to the jury the testimony of those witnesses at the criminal trial. The problem of presenting testimony through "dead witnesses" was particularly serious since plaintiffs' counsel believed some of the Government witnesses had not testified well and/or their credibility had been weakened at the criminal trial.

In spite of these weaknesses of plaintiffs' case, Cambridge-Lee and Cerro also had good reason to avoid the uncertainties of litigation. While the government failed to secure a criminal conviction under the "beyond a reasonable doubt" standard, plaintiffs' counsel, informed by the criminal trial, might have proved that a price-fixing conspiracy was "more probable than not." Also, if plaintiffs prevailed on the pending motion for production of grand jury transcripts of witnesses who invoked the Fifth Amendment at deposition, plaintiffs might have found the strong, explicit evidence they sought concerning price-fixing practices by defendants. Furthermore, the earlier settlements provided that such settlements would not affect any joint or several liability of any other defendant. Cambridge-Lee and Cerro, as remaining non-settling defendants, were potentially liable for all of the damages caused by reason of the alleged conspiracy. The risk of substantial treble damages is one of the risks avoided by defendants' deciding to settle.

This court was satisfied that plaintiffs had enough evidence against the remaining defendants to get to a civil jury so that defendants' offer of settlement was not simply a pay-off to "legalized blackmail." This court read a substantial portion of the transcript of the criminal trial and reviewed confidential documents filed by plaintiffs as part of their motion for class certification in Civil Action No. 84–0413. The transcripts and documents revealed allegedly conspiratorial telephone conversations regarding setting of prices, price sheets that were uncirculated (allegedly if other companies would not abide by those prices), and a price spread between the price of copper and copper water tubing that should have been but was not constant over time. This court was convinced that it was in the interest of all parties to encourage discussions of a fair and reasonable settlement with Cambridge-Lee and Cerro.

## B. Negotiation Process

■ Although the court must independently evaluate the proposed settlement, the professional judgment of counsel involved in the litigation is entitled to significant weight. *See Jamison v. Butcher &*

*Sherrerd,* 68 F.R.D. 479 (E.D.Pa.1975). The decision to settle on negotiated terms was made by highly experienced counsel, especially competent with regard to class action litigation. Seymour Kurland, Esquire, Leonard Barrack, Esquire and associated counsel have successfully litigated numerous class actions. They were personally involved with all aspects of these settlement negotiations and their decision to accept these settlement agreements on behalf of the class was made after a thorough evaluation of all. relevant factors, including the competence, experience and tenacity of opposing counsel.

The Cambridge-Lee and Cerro settlements were not achieved for over a year after the criminal acquittals. For most of this period, class and defense counsel had a number of settlement conversations but the position of the parties remained far apart. The court participated in some of these negotiating sessions, and met with counsel and their principals. Because of this firsthand observation of the unflagging determination with which each party's attorney sought to promote the best interest of his respective client, the court has great confidence that these settlement agreements are in the best interest of the class.[8]

## C. Reaction of the Class

■ When notices of this litigation and of the Halstead, Howell, Phelps Dodge and Revere settlements were mailed to 37,000 recorded addresses of members of the stipulated settlement class and twice published in *The Wall Street Journal,* only 46 entities, or .13% of the class, opted to exclude themselves from the class. (A substantial portion of these addresses were duplicative, but the number of entities opting out is still exceedingly small.) A second notice informing class members of the Cambridge-Lee, Cerro and Mueller settlements was mailed to the stipulated class; at that time, members of the class could no longer exclude themselves from the class so non-exclusion cannot be used as an indicia of non-objection.

But it is extremely relevant that no member of the class has raised any objection to the proposed settlements. "[T]his unanimous approval of the proposed settlements by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *In re Art Materials Antitrust Litigation,* 100 F.R.D. 367, 382 (N.D.Ohio 1983). Additionally, approximately 1,890 class members filed claim forms. This indicates considerable satisfaction with the results of the litigation. *See* discussion of percentage claims filed in *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 92–93 (3d Cir.1985).

## D. Amount of the Settlement

■ The court must review a settlement to determine whether it falls within a "range of reasonableness," not whether it is the most favorable possible result of litigation. *See Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom., Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) ("in any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"). Because of the inherent risks of litigation, "the vast majority of courts which have approved settlements in [antitrust class actions] ... have given their approval to settlements which are traditionally based on an estimate of single [rather than treble] damages," *City of Detroit v. Grinnell Corp.,* 495 F.2d at 458.

■ Cerro's $3.825 million settlement represents approximately .88% of $434.3 million in sales during 1979–82, the four years prior to the filing of the complaint; (the statutory limitations period governing antitrust claims is four years). Cerro's ratio of settlement to sales is substantially

---

**8.** It should be noted that Cerro has settled for 68% more and Cambridge-Lee for 63.6% more than their respective offers of judgment of June 7, 1984.

less than the 2.4% settlement ratio of Phelps Dodge, a similarly situated defendant.[9] However, Phelps Dodge settled after its criminal indictment but before the criminal trial; Cerro settled after the criminal acquittals. A criminal conviction would have constituteed *prima facie* evidence of liability in this civil litigation; the acquittals constituted a material change in circumstances concerning the litigation which legitimately and reasonably caused plaintiffs to revise their estimates of settlement value. (*See* Memorandum Opinion, July 26, 1985).

 This court was privy to conversations with class counsel regarding plaintiffs' settlement negotiation guidelines and observed plaintiffs' recalculate the settlement potential with Cerro downward following the criminal trial acquittals. Plaintiffs' failure to uncover a "smoking gun" or other conclusive evidence of unlawful conspiracy during civil discovery coupled with the tough negotiating posture of Cerro's counsel made it reasonable for plaintiffs to accept the .88% settlement ratio.[10]

 Cambridge-Lee's $900,000 settlement represented approximately .3% of 1979–82 sales of $302.1 million. While this settlement, which was agreed to just one month prior to the Cerro settlement, is substantially less than Cerro's settlement, it is reasonable in light of Cambridge-Lee's special circumstances. Unlike Cerro, Cambridge-Lee is not a manufacturer but rather a "super distributor" of copper water tubing and other products. Cambridge-Lee has fewer assets and a weaker cash position than a manufacturing concern like Cerro. Additionally, the late 1984 Dun & Bradstreet reports on Cambridge-Lee and certain other documents filed by Cam-

bridge-Lee under seal but provided to plaintiffs' co-lead counsel, convinced plaintiffs and the court that it was reasonable to accept in settlement six $150,000 payments with interest accruing at the prime rate.[11] Courts may consider a defendant's special financial situation as a factor in approving a settlement. Hardship on the part of a settling defendant may warrant approval of a settlement. *In re South Central States Bakery Products*, 88 F.R.D. 641, 643 (M.D.La.1980) ("Courts may consider a defendant's solvency to be a factor in approving a settlement.")

## CONCLUSION

 For the foregoing reasons, the court finds that the Cambridge-Lee and Cerro settlements provide the class members with the guarantee of a substantial benefit which, when weighed against the costly and uncertain prospect of obtaining judgment at trial, is clearly in the interest of the class as a whole. The court approves these settlements as fair, reasonable and adequate.

## EXHIBIT A

### FISHER BROTHERS v. CAMBRIDGE–LEE AND RELATED ACTIONS

Master File No. 82–4921
CLASS MEMBERS WHO HAVE ELECTED TO BE EXCLUDED FROM THE CLASS

1. Allied Bronze Corporation
 25–11 Hunterspoint Avenue
 Long Island City, New York 11101
2. Bennett Brake Service, Inc.
 803 West Rayen Avenue
 Youngstown, Ohio 44501

---

9. At a 2.4% ratio, Cerro would have paid approximately $10 million in settlement.

10. Plaintiffs in this case made no attempt to obtain settlements based on a certain percentage of the (tainted) sales reflecting price-fixing by defendants. Such settlements would have necessitated expert information concerning damages of a precision that plaintiffs planned to obtain only if they were to proceed to trial.

11. Additionally, Phelps Dodge initially contended that Cambridge-Lee, as well as Cerro, was similarly situated and that the Cambridge-Lee settlement violated the Phelps Dodge most favored nations clause. However, after reviewing these confidential documents, Phelps Dodge withdrew its contention that Cambridge-Lee was similarly situated. *See* Memorandum Opinion dated July 26, 1985.

3. Besco Supply Company
10910 East 56th Street South
Tulsa, Oklahoma 74146
4. Blissfield Manufacturing Company
626 Depot Street
Blissfield, Michigan 49228
5. Brown Pipe and Supply of Artesia,
Inc.
701 South First Street
P.O. Box 68
Artesia, New Mexico 88210
6. Clark Hardware Company
1414 Fourth Avenue South
P.O. Box 23249
Nashville, Tennessee 37202
7. Culver Company
2623 East 54th Street
P.O. Box 2345
Huntington Park, California 90255
8. Duncan Supply Company, Inc.
910 North Illinois Street
Indianapolis, Indiana 46204
9. Ed's Supply Company, Inc.
711 6th Avenue
Nashville, Tennessee 37203
10. Erwin Supply Company
P.O. Box 5
Shinnston, West Virginia 26431
11. Eveready Burner Supply Corp.
406 North Wantagh Avenue
Bethpage, Long Island, New York
11714
12. Franklin Supply
4500 South Garnett, Suite 800
P.O. Box 470700
Tulsa, Oklahoma 74147
13. Grif-Fab Corp.
5350 Newport Street
Commerce City, Colorado 80022
14. International Cold Storage Company,
Inc.
215 East 13th Street
P.O. Box 425
Andover, Kansas 67002
15. Knox Tile and Marble Distributors
11232 Indian Trail
Dallas, Texas 75229–3584
16. Koppers Company, Inc.
Pittsburgh, Pennsylvania 15219
17. Meier Metal Servicecenters, Inc.
1471 East Nine Mile Road
Hazel Park, Michigan 48030
18. Mercer County Automotive
Warehouse, Inc.
2370 Broadway Road
West Middlesex, Pennsylvania 16159
19. Marex International Company
165 Madeira Avenue
Coral Gables, Florida 33134
20. Mississippi Wholesale Hardware, Inc.
2313 14th Avenue North
P.O. Box 826
Columbus, Mississippi 39701
21. Mountain Plumbing Supply Company
Main Street
P.O. 17
Tannersville, New York 12485
22. Noranda Metal Industries, Inc.
U.S. Sales Office
27 Glen Road
Sandy Hook, Connecticut 06482
23. R & R Supply Company, Inc.
P.O. Box 2166
Orlando, Florida 32802
24. Sporlan Valve Company
7525 Sussex Avenue
St. Louis, Missouri 63143
25. Union Carbide Corporation
Linde Division
P.O. Box 710 (Middle Road)
Ashtabula, Ohio 44004
26. Water Works Supply Company
660 State Highway 23
P.O. Box 306
Pompton Plains, New Jersey 07444
27. Wise Supply Company, Inc.
311 South Columbia Street
Union City, Indiana 47390
28. Diamond Hill Supply Company, Inc.
P.O. Box F–5
Florence, South Carolina 29502
29. Virginia Sprinkler Co., Inc.
P.O. Box 986
Ashland, Virginia 23005
30. Daniel Radiator Corp.
10650 Haddington Drive
Houston, Texas 77043
31. Y/P Products, Inc.
P.O. Box 308
Emigsville, Pennsylvania 17318
32. Emergency Supply Co., Inc.
6773–79 Olive Boulevard
St. Louis, Missouri 63130
33. A & J Piping Products, Inc.
821 Jupiter Road # 300
Plano, Texas 75074
34. Lane Manufacturing Company, Inc.
P.O. Box 1357
Hartsville, South Carolina 29550
35. M & C Pipe & Supply, Inc.
Rt. 1—Box 364M
Leesburg, Florida 32748
36. Hi-Mill Manufacturing Co.
1704 Highland Road
Highland, Michigan 48031
37. Pumps, Inc.
11072 West 44th Avenue
Wheat Ridge, Colorado 80033
38. A & J Enterprises, Inc.
P.O. Box 424
Gates Mills, Ohio 44040

39. Major Supply, Inc.
 1133 Quaker Street
 Dallas, Texas 75207
40. Western Drilling Tool & Supply Co., Inc.
 P.O. Box 593
 Chanute, Kansas 66720
41. Marmetal Industries, Inc.
 903 Sheehy Drive
 Horsham, PA 19044
42. Campbell Fittings, Inc.
 P.O. Box 238
 Boyertown, PA 19512
43. Allied Supply Company
 1100 E. Monument Avenue
 Dayton, Ohio 45402
44. Watkins, Inc.
 711 West Second Street
 P.O. Box 117
 Wichita, Kansas 67201
45. Offshore Traders, Inc.
 354 Sevilla Avenue
 Coral Gables, Florida 33134
46. Tondre Supply, Inc.
 313 Waterman Avenue, Rte # 104
 Smithfield, Rhode Island 02917

## JUDGMENT ORDER

AND NOW, this 2nd day of October, 1985, for the reasons stated in the foregoing Memorandum, the court finds that:

1. The terms of the Agreements of Settlement with defendants Cambridge-Lee Industries and Cerro Copper Products Co., Inc. are fair, reasonable, and adequate to the class.

2. All class members have been served with notice of the proposed Agreements of Settlement and the hearing thereon, either directly or by publication in accordance with the court's order of May 17, 1985 directing same.

3. Notice by mail and publication was the best practicable in the circumstances.

THEREFORE, it is ORDERED that:

1. These settlements are approved on behalf of the following class, except all members who have previously excluded themselves and are listed in Exhibit A:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their parents, subsidiaries and affiliates, and their alleged co-conspirators) who have, during the time period January 1, 1975 through November 30, 1982 (hereafter referred to as the 'covered period'), purchased copper water. tubing directly from one or more of the defendants (including defendants' subsidiaries and affiliates) or their alleged co-conspirators.

2. Each plaintiff and · member of the class who did not timely exclude itself is deemed to have agreed forever to refrain from proceeding against defendants Cambridge-Lee Industries, Inc. and Cerro Copper Products Co., Inc., their successors, assigns, affiliates, subsidiaries and predecessors, and any and all of their present and former directors, employees and agents, on any claims and causes of action which have been, might have been, are now or could be asserted in this action, and which are based upon allegations of collusion, combination or conspiracy or other conduct which might have been asserted under the federal antitrust laws with respect to the sale of copper water tubing during the period January 1, 1975 to November 30, 1982.

3. Without affecting the finality of this judgment in any way, this court reserves jurisdiction over the implementation of these settlements, including approving a final plan of distribution, resolving disputed claims by any class member, and awarding attorneys' fees and any additional expenses.

4. In accordance with the court's findings herein, the Clerk of the Court is directed to enter final judgment pursuant to Fed. R.Civ.P. 54(b).