**PETRUZZI'S, INC., formerly known as Petruzzi's IGA Supermarkets, Inc., Plaintiff,**

v.

**DARLING–DELAWARE COMPANY, INC. and Moyer Packing Company, Defendants.**

Civ. A. No. 86–0386.

United States District Court, M.D. Pennsylvania.

Feb. 15, 1995.

Richard A. Russo, Rosenn Jenkins & Greenwald, Donald H. Brobst, Larry S. Keiser, Chariton & Keiser, Wilkes–Barre, PA, Warren Rubin, Bernard M. Gross, Philadelphia, PA, for plaintiff.

Thomas R. Bearrows, Caryn S. Mohan, Winston & Strawn, Chicago, IL, David Acker, Williams Bay, WI, for Darling Delaware Co. Inc.

Philip Salkin, Pearlstine, Salkin, Hardman & Robinson, Lansdale, PA, David H. Marion, Gilbert F. Casellas, Francis P. Newell, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Moyer Packing Co.

Ted Wells, Lowenstein & Sadler, Roseland, NJ, for Standard Tallow Corp.

David E. Koff, Koff, Wendolowski, Ferguson & Mangan, P.C., Wilkes Barre, PA, for Ralph Ebersole.

Patrick J. O'Connor, Douglas B. Lang, Cozen & O'Connor, Philadelphia, PA, for Robzens' Inc.

## MEMORANDUM

VANASKIE, District Judge.

Petruzzi's, Inc., the named plaintiff in the above-captioned anti-trust class action, has moved for approval of a proposed *partial* settlement involving only one of the two remaining defendants in this protracted litigation. The proposed settlement purports to extinguish the potential liability of Moyer Packing Company ("Moyer" or the "Settling Defendant") for all claims "arising out of, relating to or in any way connected with or based upon any act(s), failure(s) to act, transaction(s), practice(s), or conduct which was or could have been described in or made the subject of [this litigation]." (Settlement Agreement with Moyer at 6 Ex. "B" to the Memorandum in Support of Plaintiff's Motion for Final Approval of Class Action Settlement (Dkt. Entry 349).) The Settlement Agreement provides that the class members whose claims against Moyer will be discharged include all individuals, partnerships, corporations and other entities who, during the period January 1, 1977 to December 31, 1985, sold "inedible fats, bones, suet or meat trimmings" not only to Moyer, but also to co-defendant Darling–Delaware, Inc. ("Darling"). (*Id.* at 3.) In consideration of the release of all claims, Moyer has agreed to provide up to $2 million in "premium certificates" which are to "be claimed by class members based on the dollar value of their sale of raw materials to Moyer within the [relevant] geographic area in up to five of the nine calendar years 1977 through 1985, for

eleven (11%) percent of the dollar value of such sales to Moyer." (*Id.* at 4.)

Robzens' Inc., ("Robzens"), a member of the class who sold raw materials to Darling, has objected to the proposed partial settlement, asserting, *inter alia,* that the more than 600 class members who sold only to Darling are unfairly excluded from participating in the settlement distribution and receive no consideration in return for their full and complete release of Moyer. Although Robzens is the only member of a class comprised of more than 1,200 members to object to the proposed settlement, its challenge is indeed formidable. After careful consideration of the parties' written submissions as well as their oral arguments presented on December 28, 1994, I am constrained to conclude that the proponents of the partial settlement have not discharged their burden of establishing that, with respect to the class as a whole, the settlement is "fair, adequate and reasonable." *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118 (3rd Cir.1990). Accordingly, the proposed settlement will not be approved and Plaintiff's "Motion for Judgment of Dismissal with Prejudice of Claims of Plaintiff Class as to Defendant Moyer Packing Co." (Dkt.Entry 348) will be denied.[1]

### BACKGROUND

On March 14, 1986, Petruzzi's, Inc., formerly known as Petruzzi's IGA Supermarkets, Inc. (hereinafter referred to as "plaintiff" or "Petruzzi's"), commenced this class action against Darling, Moyer, Standard Tallow Corp. ("Standard Tallow"), and Herman Isacs, Inc.[2] The complaint alleged that the defendants had conspired to allocate customers in the fat and bone rendering industry in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

Members of the putative class were butcher shops, supermarkets, restaurants, hotels, etc. that sold inedible fats, bones, suet, and meat trimmings ("raw material") to the defendants in the pertinent geographic area during calendar years 1977 through 1985.[3] Petruzzi's contended that although the defendants competed for *new* raw material accounts, they had agreed to refrain from soliciting accounts that had been secured or "loaded" by another defendant.

Following extensive discovery, the defendants moved for summary judgment. In a lengthy opinion issued on July 31, 1992, the Honorable James F. McClure of this Court granted summary judgment in favor of each of the defendants. In an opinion filed on July 13, 1993, the United States Court of Appeals for the Third Circuit reversed the Order of July 31, 1992 insofar as it had granted summary judgment to Moyer and Darling. 998 F.2d 1224. As to Standard Tallow, however, our Court of Appeals concluded that plaintiff had failed to present evidence sufficient to withstand its summary judgment motion. *Id.* at 1241. On November 29, 1993, the Supreme Court denied the Petition for Writ of Certiorari filed on behalf of Moyer and Darling. —— U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).[4]

On remand, plaintiff was authorized to provide notice to members of a class certified under Federal Rule of Civil Procedure 23(b)(3).[5] The notice approved by Order dat-

---

1. In connection with the proposed partial settlement, plaintiff has also moved for approval of attorneys' fees of $1 million. (Dkt. Entry 346). The Motion for Approval of Attorneys' Fees will be dismissed as moot.

2. Herman Isacs, Inc. was dismissed for lack of personal jurisdiction. *See* 677 F.Supp. 289 (M.D.Pa.1987).

3. The relevant geographic area is comprised of a number of counties in Pennsylvania, New Jersey, and Connecticut. *See* Moyer Settlement Agreement at 3.

4. The Third Circuit's opinion sets forth in great detail the factual background of this case. The Court of Appeals' recitation of the facts of this case will not be restated here.

5. Rule 23(b)(3) authorizes certification of a class action when "the court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The class certified in this action is defined as:

   [A]ll individuals, persons, proprietorships, partnerships, corporations and other entities (excluding defendants, their subsidiaries, their affiliates and co-conspirators) who are accounts of defendants and sold raw material directly to any defendant in the geographic

ed January 12, 1994 informed members of the class of their right to "opt out" of the class. Of the approximately 1,250 class members, only 21 elected to be excluded from the class. According to the representations of counsel, approximately 50% of the class members did not sell raw materials to Moyer during the relevant period.

On March 2, 1994, this case was reassigned to me. Trial was scheduled for October, 1994. During the intervening period the parties were to complete expert witness discovery and file motions in limine.

A court-conducted settlement conference was convened on June 6, 1994. Negotiations between plaintiff and Moyer continued after that date. In September, Plaintiff and Moyer indicated that a settlement between them was likely. The final Settlement Agreement was executed by counsel for Plaintiff and Moyer on September 29, 1994.

In pertinent part, the Settlement Agreement provides:

a. Moyer will make up to $2 million in premium certificates available for the benefit of the plaintiff and the plaintiff class. Premium certificates may be claimed and redeemed as follows:

(1) Certificates may be claimed by class members based on the dollar value of their sales of raw materials to Moyer within the geographic area in up to five of the nine calendar years 1977 through 1985, for eleven (11%) percent of the dollar value of such sales to Moyer. Verification of all claims shall be furnished by each class member upon request.

(2) Certificates will be issued to claimants in six equal amounts, each worth one-sixth of the total value due to the claimant. These six equal amounts will be redeemable in six successive six-month periods. Each of these six equal amounts will be redeemable only in its respective six-month period; the first one-sixth of the certificates will be re-

deemable only in the first six-month period, and so forth.

(3) Certificates may be redeemed during the specified six-month period for a premium payment on new sales of raw materials to Moyer, up to 20% of the actual dollar value of such sales of raw materials.

(4) Certificates may be transferred, but may only be redeemed for premium payments on new sales of raw material to Moyer within the specified time period and within the geographic area.

b. Moyer will pay up to $1 million in cash for attorneys' fees, as approved by the Court, in six equal installments, each of which will be due on the first date of each six-month period on which certificates may be redeemed.

c. Moyer will pay up to an additional $200,000 for expenses as approved by the Court, also in six equal installments....

In consideration of the foregoing, each member of the class is to release Moyer from all liability relating to this litigation. A condition precedent to the settlement is entry of an order that, *inter alia*, permanently bars and enjoins all persons and entities, including Darling, from filing or prosecuting any claim for contribution or indemnity.[6] The Settlement Agreement also contains a "most favored nations" clause, which provides that "no settlement will be entered into with the non-settling defendant, Darling, on terms more favorable to Darling than the terms set forth in this Agreement, without also making the terms of such proposed settlement available to Moyer."

By Order dated November 1, 1994, preliminary approval was granted to the Moyer Settlement Agreement. (Dkt.Entry 339.) The November 1st Order also approved the form of a "Notice of Hearing on Proposed Partial Settlement and Procedure for Filing Claims." The Notice, *inter alia*, informed class members that (a) "[t]he settlement with Moyer will resolve all claims by class members against Moyer ..."; (b) "[t]he claims

area from January 1, 1977 to December 31, 1985.

6. Plaintiff acknowledges that, at a minimum, "premium" payments made under the settlement agreement will be set-off against any treble damage recovery obtained against Darling.

against Darling will continue to be prepared for trial regardless of whether the settlement with Moyer is approved"; and (c) "[i]f the settlement is approved, Moyer will no longer be a defendant, and the amount paid by Moyer will be credited against any recovery obtained in the proceedings from the remaining defendant." The Notice set December 12, 1994 as the deadline for filing objections to the proposed settlement, and scheduled a hearing on the proposed settlement for December 28, 1994.

As noted above, Robzens was the only class member to file objections to the proposed partial settlement. (Dkt.Entry 359.) Both plaintiff and Moyer filed written responses to Robzens' objections. (Dkt.Entries 360 and 361.) A hearing was conducted on December 28, 1994, at which counsel for all interested parties presented arguments in support of their respective positions.[7]

By letter dated January 6, 1995, Moyer submitted a Proposed Form of Final Judgment. On January 10, 1995, Robzens filed objections to the Proposed Form of Final Judgment, reiterating its contention that the proposed settlement is fatally defective because it does not include any distribution to those class members who did not sell to Moyer during the relevant time period.

## DISCUSSION

■ Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court...." While consideration of a settlement agreement "must be guided by 'the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement,'" *In re: Domestic Air Transportation Antitrust Litigation,* 148 F.R.D. 297, 312 (N.D.Ga.1993), judicial review is not limited to ascertaining whether the settlement agreement is the product of fraud or collusion. Instead, the reviewing court has an independent duty to ensure that the proponents of the settlement have met their burden of establishing that the settlement is

"fair, adequate, and reasonable." *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118 (3d Cir.1990); *Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983). "In assessing the fairness of a proposed compromise, the court must consider 'the rights and interests of *each* class member.'" *Reynolds v. King,* 790 F.Supp. 1101, 1105 (M.D.Ala. 1990) (emphasis added). "[I]n order to protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." 2 *Newberg on Class Actions,* § 11.40 (1985). "The Court's primary concern is whether a settlement, taken as a whole, is *fundamentally* fair, adequate and reasonable to *all* concerned." *In re: Washington Public Power Supply System Sec. Litig.,* 720 F.Supp. 1379, 1387 (D.Ariz.1989), *aff'd sub nom., Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992) (emphasis added). In determining whether the proposed settlement is fundamentally fair, adequate and reasonable to all concerned, the following factors are to be considered:

(1) The complexity, expense and likely duration of the litigation;

(2) The reaction of the class to the settlement;

(3) The stage of the proceedings and the amount of discovery completed;

(4) The risks of establishing liability;

(5) The risks of establishing damages;

(6) The risks of maintaining the class action through trial;

(7) The ability of the defendants to withstand a greater judgment;

(8) The range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) The range of reasonableness of the settlement fund compared to a possible recovery in light of all the attendant risks of litigation.

**7.** No evidence, as such, was submitted at the hearing, although plaintiff's Memorandum in Support of its Motion for Final Approval of Class

Action Settlement was admitted, without objection.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). *See also, Stoetzner*, 897 F.2d at 118.

A number of these factors favor approval of the proposed settlement. The extensive discovery concluded in this matter, reflected in the summary judgment record, provides an ample basis for evaluation of a proposed settlement. The fact that only one class member has presented objections favors approval, although "[t]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement. . . ." *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1437 (E.D.N.Y.1989), *aff'd in part, reversed in part*, 907 F.2d 1295 (2d Cir.1990). There are substantial risks of establishing liability, as evidenced by the fact that one Judge of this Court had concluded that plaintiff had failed to present sufficient evidence to withstand a summary judgment. There are also substantial risks of establishing damages. Although plaintiff anticipates being able to present evidence of damages totalling approximately $40 million, defendants have maintained that, at best, damages are less than $600,000. As plaintiff points out, a settlement based on 11% of sales over five years compares favorably with other settlements in anti-trust litigation. *See* Memorandum in Support of Plaintiff's Motion for Final Approval of Class Action Settlement (Dkt.Entry 349) at 27–28.)

■ Approval of the settlement is not defeated by the fact that the settlement fund to be distributed to class members consists of "premium certificates" redeemable over a three-year period. Settlements based upon "discount" coupons have been approved in a variety of contexts. *See, e.g., In re: Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297 (N.D.Ga.1993); *New York v. Nintendo of America, Inc.*, 775 F.Supp. 676 (S.D.N.Y.1991); *Langford v. Bombay Palace Restaurants, Inc.* No. 88–5279, 1991 WL 61107 (S.D.N.Y. Apr. 8, 1991); *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 WL 21981 (N.D.Ill. Sep. 14, 1984); *In re: Cuisinart Food Processor Antitrust Litigation*, 1983 WL 153 (D.Conn. Oct. 24, 1983); *Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F.Supp. 1 (N.D.Ohio 1982). Analytically, there appears to be no reason to distinguish between a settlement based upon "discount coupons" and a settlement based upon "premium certificates" pursuant to which additional compensation is received for the sale of the product.

■ Unlike the matter *sub judice*, however, those courts which gave their imprimatur to non-cash settlements had some basis for estimating the *real* value of the settlement, thereby enabling the court to determine whether the settlement was within the range of reasonableness in light of the best possible recovery and the risks of litigation. For example, the proponents of the settlement in the *Domestic Air Transportation Litigation* provided expert witness evidence concerning likely redemption rates that enabled the court to conclude that the value of the coupon program was 50% to 75% of the face value of the coupons. 148 F.R.D. at 320–23. Expert witness evidence also provided a foundation for evaluating discount coupon settlements in *Nintendo*, 775 F.Supp. at 681, and *Ohio Public Interest Campaign*, 546 F.Supp. at 11. *Phemister* involved both a cash distribution and discount coupons. In *Langford*, class members had the option of exchanging discount coupons for cash equal to 30% of the face value of the coupons. Both cash and "product discounts" were involved in *In re: National Media Corporation Securities Litigation*, No. 90–7574, 1992 WL 237362 (E.D.Pa. Sep. 15, 1992).[8]

In this case, neither plaintiff nor Moyer has presented evidence concerning likely redemption rates. Premium claims are based on sales of raw materials that occurred 10 to

8. The settlement in *In re: Cuisinart, supra*, involved only discount coupons, but the case was settled prior to certification of a class so that putative class members had the ability to opt out of the class with knowledge of the settlement terms. By way of contrast, the class members in the matter *sub judice* cannot opt out of the settlement and will be bound by any settlement agreement approved by this Court. Ascertainment of the actual value of a "coupon-type" settlement would appear to have more relevance in a case, such as the instant matter, in which class members do not have the opportunity to opt out of the class with knowledge of the proposed settlement terms.

18 years ago, but no information has been submitted concerning the number of class members who remain Moyer "accounts" at the present time. Moreover, no evidence has been presented concerning the number and value of claims submitted. Also relevant is information concerning the size of class members' existing accounts with Moyer. Certificates may be redeemed only for 20% of the certificate holders business during a sixth-month period. Thus, a holder of a certificate having a value of $100,000 would be required to sell $500,000 in raw materials to Moyer in order to obtain the full value of the certificate. The actual value of the settlement cannot be estimated without such information.[9]

Plaintiff argues that the value of the premium certificates is enhanced because they are transferable. While transferability of coupons is likely to enhance redemption rates, see, e.g., Domestic Air Transportation Litigation, 148 F.R.D. at 320–23, 331; Cuisinart, supra, Moyer's production limits and the demand for its products impose constraints on transferability not present in discount coupons made available in settlement of consumer class actions. As counsel for Moyer observed:

[T]here are a number of factors which lead [Moyer] to buy from certain people and not to buy from others and that will continue in the future regardless of what is proved here and what has happened.... [Moyer] can't agree to suddenly buy 10 times as much fat, bone, grease, whatever it is, than [it] ever bought before or that [it] could ever use.... [Tr. at 40.]

The actual value of the settlement may also be diminished by the absence of safeguards to prevent Moyer from reducing the price it pays for raw materials to compensate for the necessity of paying "premiums." The existence of safeguards to prevent "deflation" of non-cash certificates clearly enhances the value of the certificates. See, e.g., Domestic Air Transportation Litigation, 148 F.R.D. at 321, 331 (discount certificates usable at any published fare, including the cheapest deep-discount promotional fairs, and airlines unable to negate the economic usefulness of the certificates by raising air fares); Nintendo, 775 F.Supp. at 681 (settlement included "sufficient controls" that prices would not be increased to compensate for $5 discount coupons). In light of the nature of this litigation, involving purchases by the defendants, the absence of controls concerning the price paid by Moyer does appear to have a negative impact on the value of the premium certificates.

Concededly, Moyer is "banking on" the fact that the actual cost of the settlement will be less than its face value. (Tr. at 41.) The fairness, reasonableness and adequacy of the settlement, however, cannot be assessed without some reasonably reliable estimate of the reduced value. It is also important to be able to estimate the actual value of the settlement in order to assess the appropriateness of making up to $1.2 million in cash available for attorneys' fees and expenses. If, for example, the actual value of the premium certificates is only 10% to 20% of their face value, it would seem inappropriate to make available to class members approximately $200,000 to $400,000 while providing $1 million for attorneys' fees and reimbursement of up to $200,000 in litigation expenses.[10]

I am mindful of the fact that not one class member who had been an account of Moyer has objected to this proposed settlement. I am also aware of plaintiff's contention that

---

9. The deadline for filing claims was two weeks after the December 28, 1994 hearing. In fairness to the experienced and extremely able counsel representing the plaintiff class and Moyer, I did not request information concerning the number of eligible claimants remaining in business and the value of claims presented. The objector, however, did question whether the actual value of the premium certificates was equal to their face value. (Transcript of December 28, 1994 Hearing (Tr.) at 18.) The settlement proponents did not directly address this issue. It is troubling, however, that in addressing the question of

the amount of a potential set-off against any judgment against Darling, plaintiff's counsel assumed claims of $500,000, or 25% of their face value. (Tr. at 27.)

10. As of the time of the settlement hearing, plaintiff's counsel estimated that their time in this case had a value of approximately $1.8 million. Approval of attorneys' fees in the amount of $1 million was sought. (See Plaintiff's Motion for Approval of Attorneys' Fees (Dkt. Entry 346).)

the settlement, negotiated at arms-length, represents the "absolute maximum that Moyer would pay to settle this case." (Memorandum in Support of Plaintiff's Motion for Final Approval of Class Action Settlement (Dkt.Entry 349) at 19.) But the fairness and adequacy of this settlement cannot be ascertained without having some basis for estimating its actual value.

█ If this were the only ground for disapproval of the settlement, I would schedule another hearing to afford the settlement proponents an opportunity to present evidence on the value of the settlement. But the fact that the Moyer "premium certificates" are distributable only to those class members who were Moyer "accounts" during the relevant time frame is a fatal defect in the settlement plan. Approximately 50% of the class will not receive any "premium certificates," but their claims against Moyer will be discharged. This disparate treatment of class members has not been justified by the settlement proponents, and is sufficient reason in and of itself to disapprove the proposed settlement.

The parties have not cited a single case that approves a settlement that provides compensation to 50% of the class but requires the entire class to release its claims against the settling defendant. Plaintiff concedes that "to a certain extent, this is a *sui generis* case." (Tr. at 21.) Independent research has not disclosed a case that sanctions a settlement that provides direct economic benefit to 50% of the class in exchange for release from 100% of the class.

The settlement proponents contend that *Domestic Air Transportation Litigation* supports approval of the Moyer settlement. In that case, the court approved settlements based largely upon discount coupons for air travel. With one exception, the discount coupons were interchangeable for travel with any of the defendants. The exception was the "ice breaker" settlement negotiated with Northwest Airlines. The Northwest settlement provided that its travel certificates would be redeemable only for travel on

Northwest. Significantly, however, the distribution of the certificates was not limited to Northwest customers; the settlement proponents in this case concede that the Northwest travel certificates were available for distribution to *all* members of the class. (Tr. at 23.) Moreover, the Northwest travel certificates were transferrable to persons desiring to fly on Northwest Airlines and were not dependent upon the willingness of a defendant to purchase goods from a class member. It is also significant that the Northwest settlement provided "larger redemption amounts than those provided for in the other settlement[s].... " 148 F.R.D. at 332 n. 42. Thus, while the travel certificates distributable to *all* class members were redeemable only for travel on Northwest, this limitation was off set by the larger redemption amounts provided in the Northwest settlement. Approval of the Northwest settlement thus cannot be viewed as sanctioning a partial settlement that provides economic benefits to only 50% of the class.[11]

A more apt analogy than a settlement restricting all class members' use of discount coupons to one of the alleged anti-trust co-conspirators may be found in those cases in which a segment of the class receives more favorable treatment than the remainder of the class. Where a proposed settlement provides more favorable treatment to the named plaintiffs, careful judicial scrutiny is required " 'to ensure that the burden of settlement is not shifted arbitrarily to a small group of class members.' " *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir.1983). Under such circumstances, "a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness." *Id.* at 1147. The proponents of a settlement that requires a release of *all* class members in exchange for direct economic benefit to 50% of the members similarly carry a substantial burden to show that the settlement is fair to the class as a whole.

In this regard, "fairness" is not demonstrated by the silence of class members in response to the proposed settlement. As

---

11. It should be noted that in the *Domestic Air Transportation Litigation* the court examined proposed settlements of the entire action collec-

tively, although it did indicate that it found "each individual settlement ... suitable for approval...." *Id.* at 313 n. 17.

stated by Judge Friendly in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 16 (2d Cir.1981), "[l]ack of objection by the great majority of claimants means little when the point of objection is limited to a few whose interests are being sacrificed for the benefit of the majority." In this case, the point of objection is not limited to a "few" class members, but the gain of one segment of a class should not be premised on the sacrifices of the other segment.

In *National Super Spuds*, an action was brought on behalf of all "persons who held a net long position in [Maine Potato Future] Contracts and who liquidated their long positions in said Contracts between April 13, 1976 and the close of trading on the Exchange on May 7, 1976." *Id.* at 11. A proposed settlement called for distribution of a settlement fund among class members on the basis of the contracts they had liquidated. The release to be given in exchange for the distribution extinguished claims based on *both* liquidated *and* unliquidated contracts. Only one party objected to the settlement on the basis that he was being treated unfairly *vis-a-vis* other class members because he was not receiving any consideration for the release of his claims based on unliquidated contracts. In reversing the district court's approval of the settlement, the Second Circuit explained:

> The formula for allocating the settlement fund does not provide for any additional payment to [the objecting party] or persons similarly situated in return for the release of claims based on unliquidated contracts. There is no justification for requiring [the objecting party] or persons similarly situated to release claims based on unliquidated contracts as part of the settlement in which payments to class members are to be determined solely on the basis of the contracts they liquidated. *Id.* at 18.

Although *National Super Spuds* may be distinguished from the instant matter because the settlement in that case sought to extinguish claims not encompassed within the class certification, its principle that "[a]n advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of [class] members," *id.* at 19, is fully applicable here. *See also Piambino v. Bailey*, 610 F.2d 1306, 1329 (5th Cir. (settlement that required significant segment of class to relinquish rights as judgment creditors, thereby placing the judgment creditors on the same footing as other class members, disapproved), *cert. denied, Piambino v. Sylva*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); *Holmes, supra,* (allocation of 50% of the settlement fund to the named plaintiffs disapproved); *Reynolds v. King*, 790 F.Supp. 1101 (M.D.Ala.1990) (settlement providing disproportionate allocation of settlement fund to named plaintiffs disapproved). There simply is no justification for requiring non-Moyer account class members to release their claims without any consideration being provided for their release.

The settlement proponents argue that the disparate treatment in this case should be sanctioned because the Moyer settlement is an "ice breaker" which, if approved, will result in a settlement with Darling. To date, however, there has been no sign that Darling is yielding to any pressure that might be brought to bear by a settlement with its alleged co-conspirator. Certainly, the increased *probability* of a settlement with Darling would not appear to provide consideration for the release of the claims of non-Moyer accounts.

Significantly, the legal rights of class members who were accounts of Moyer and those who were not Moyer accounts are analytically indistinguishable. If, as alleged by plaintiff, Moyer and Darling conspired to restrain trade, the Darling accounts would have the same legal rights against Moyer as would the Moyer accounts. Plaintiff alleges that the conspiracy depressed prices for raw materials. In other words, unrestrained competition for both new and existing accounts would have increased prices by a certain percentage. Thus, the *same* type of injury was purportedly sustained by *all* class members, and *all* class members have the *same* right of recovery against Moyer. Thus, while disparate treatment of class members may be justified by a demonstration that the favored class members have different claims

or greater damages, *e.g., Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 WL 21981 (N.D.Ill.1984), no such demonstration has been made here.

Plaintiff asserts that "[t]he partial settlement ... provides a substantial recovery of 11% over a five year period, an amount and duration that is a significant recovery for the *settlement class*." (Plaintiff's Response to the Objection of Robzens, Inc. at 4; emphasis added.) This assertion is misleading. The "settlement class" is the *entire* class and the partial settlement provides no recovery, let alone a substantial recovery, for approximately 50% of the class.

Plaintiff maintains that "Moyer's settlement with *its* customers is consistent with the [customer] allocation theory" on which this case is based. (*Id.* at 5.) This may be so, but *all* class members have the same claim against Moyer based on the effect of the conspiracy on prices so the theory of the case does not warrant disparate treatment of class members. Furthermore, a judicially-approved settlement that enables Moyer to provide benefits to only its customers would appear to perpetuate the type of conduct that plaintiff is attacking—lack of competition for the defendants' existing accounts.

Moyer contends that "the ability to verify asserted claims and to ensure its capacity to pay for and process future sales of raw materials" justify a settlement that provides premium certificates only to its suppliers. (Response of Defendant Moyer Packing Company to the Objection of Robzens (Dkt. Entry 361) at 2.) With respect to the verification of claims rationale, there surely are means available to verify class member sales to both Moyer and Darling. Presumably, discovery in a case such as this would have revealed information concerning Darling's purchases. Plaintiff must have some customer-specific information on which it relies to support its claim that prices paid existing accounts were reduced by the conspiracy to restrain trade.

While capacity to pay for and process future sales of raw materials may constrain distribution of "premium certificates," it does not justify a settlement that provides *no*

economic benefits to a substantial portion of the class. There would appear to be means available to address this concern, such as redemption of premium certificates without sales for a percentage of their face value.

To the extent that Moyer's economic circumstances mandate only a "premium certificate" settlement, the nature of the "rendering industry" may preclude a partial settlement on a "certificate" basis. Moyer, however, obviously has some ability to pay a substantial amount in cash, as witnessed by its agreement to pay $1.2 million for litigation expenses.[12]

■ Disapproval of this settlement will deprive a substantial part of the class of an immediate economic benefit. I also respect the opinions of experienced and able counsel that this settlement is in the best interest of the class as a whole because it improves the likelihood of a favorable outcome at trial. The opinions and recommendation of such experienced counsel are indeed entitled to considerable weight. *See Fisher Bros. v. Cambridge–Lee Industries, Inc.*, 630 F.Supp. 482, 488–89 (E.D.Pa.1985). But the opinions of counsel would provide cold comfort to those 600 or more class members who receive no economic benefit from this settlement if plaintiff is unsuccessful at trial. It simply cannot be said that a settlement which favors only 50% of the class is in the best interest of the entire class because at least some members of the class receive a benefit and the other members of the class have, in the opinion of counsel, an increased likelihood of prevailing at trial.

Although not mentioned by the parties, the court in the *Domestic Air Transportation Litigation* was confronted with an issue similar to that presented here. One of the objectors in that case contended that the settlement would extinguish certain state law claims it had asserted in separate litigation pending in Illinois. Although the court concluded that the release given by the class plaintiffs would not bar any aspect of the Illinois case, it also concluded that even if the Illinois claims fell within the release, the class settlement should be approved. Unlike

---

12. No evidence was submitted concerning Moyer's ability to fund a cash settlement.

the instant matter, the Illinois plaintiffs could have opted out of the class settlements. 148 F.R.D. at 347. The non-Moyer accounts may not opt out of the settlement. Furthermore, unlike this case, the record in the *Domestic Air Transportation Litigation* enabled the court to find that the share of recovery of the Illinois plaintiffs was not disproportionate to the share of recovery of the other members of the plaintiff class. In this case, the non-Moyer class members' share of the settlement is zero.

■ A final factor militating against approval of the potential settlement is that the "set off" resulting from the Moyer settlement is not clearly delineated in the Settlement Agreement. Plaintiff acknowledges that there must be some set-off against any judgment obtained against Darling. As explained in *Baughman v. Cooper–Jarrett, Inc.*, 530 F.2d 529, 533 (3rd Cir.), *cert. denied, Wilson Freight Forwarding Co. v. Baughman*, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976), "a plaintiff who has recovered an item of damage from one co-conspirator may not again recover the same item of damage from another conspirator." *See also, Wainwright v. Kraftco Corp.*, 58 F.R.D. 9, 12 (N.D.Ga. 1973). The notice of the settlement sent to class members provides that "the amount paid by Moyer will be credited against any recovery obtained in the proceedings from the remaining defendant." (Notice of Hearing on Proposed Partial Settlement and Procedure for Filing Claims at 4.) Robzens argues that the set off would include up to $1.2 million paid for attorneys' fees and expenses. Plaintiff acknowledges that it would be unfair to set off attorneys' fees and expenses against any judgment, and that amounts paid for attorneys' fees and expenses should be set-off only against any award of attorneys' fees made to plaintiff as the prevailing party. The problem, however, is that the Settlement Agreement fails to address this issue.

Nor does the Settlement Agreement address the calculation of set-off. If the set-off is to be based on amounts actually paid by Moyer, that amount will not be determined for three years. On the other hand, a set-off based on the value of claims made may result in a larger reduction in the judgment than is warranted.

Furthermore, the Settlement Agreement does not specify that the Moyer accounts participating in the settlement will not share in any recovery obtained by way of judgment until after the non-Moyer account class members have received a distribution equal to that which is made under the settlement to the Moyer account class members. Both the manner of calculating the set-off and the timing thereof come into play on this issue. Members of the class should be apprised of the manner in which any set-off will be calculated and how a set-off may affect a class member's potential recovery against Darling.

The most serious concern with respect to the set-off issue, however, is that the risk of a low verdict is borne entirely by the non-Moyer accounts. Both Moyer and Darling have contended that actual damages are limited to $580,000. Presumably, there will be evidence to support this assertion. If a jury award is limited to the amount of damages claimed by the defendants, then the set-off could result in a substantially diminished recovery for the non-Moyer account class members, even when the jury award is trebled.

### CONCLUSION

Undoubtedly, disapproval of the proposed settlement will be received with displeasure and frustration by plaintiff, Moyer, and their counsel. All parties have contested this litigation vigorously, and I understand that the proposed settlement was the product of tough and intense negotiations. But, in the absence of any precedent favoring this type of partial settlement, and because the settlement proponents have not justified the disparate treatment of class members, I cannot approve this settlement. To hold otherwise would sanction partial settlements that enable co-conspirators to obtain releases from all parties having the same legal rights by paying only those class members who are its customers or suppliers. Such a result does not appear to be consistent with the principles underlying class action litigation against multiple defendants whose liability would be joint and several.

I, of course, must "only approve or disapprove the settlements as presented; the Court is not free to impose any modifications on the parties." *Domestic Air Transportation Litigation*, 148 F.R.D. at 313. I do, however, implore the parties to revisit the subject of settlement in light of the concerns addressed in this Memorandum.