Sandra LACHANCE, on behalf of herself
and all others similarly situated

v.

Kevin HARRINGTON, et al.

Bruce EFRON and Philip Cohen, on
behalf of themselves and all
others similarly situated

v.

Kevin HARRINGTON, et al.

Civil Action No. 94–4383.

United States District Court,
E.D. Pennsylvania.

April 2, 1997.

As Amended April 10, 1997.

Jules Brody, Stull, Stull & Brody, New York City, Eugene A. Spector, Spector & Roseman, P.C., Philadelphia, PA, Steven G. Schulman, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Zachary A. Starr, Starr and Holman, New York City, Stephen T. Rodd, Abbey, Gardy & Squitieri, L.L.P., New York City, for Plaintiff.

Mark L. Alderman, Abbe F. Fletman, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Defendants.

### MEMORANDUM AND ORDER

YOHN, District Judge.

The parties to the instant class action law suit, alleging violation of the federal securities laws, have requested the court to approve a final settlement reached between class counsel, on behalf of the class, and the defendants. Under the terms of the settlement, the defendants would be obligated to pay $1,150,000 in cash into a gross settlement fund in exchange for the release of all class members' claims against them. Class counsel has also petitioned the court for attorney fees amounting to 30% of the gross settlement fund and for reimbursement of their expenses, as well as three $1,000 incentive awards to the named representatives in the action.

After careful consideration and close scrutiny of the proposed settlement, the court concludes that the proposed settlement in this case meets the stringent standards for settlement now required in this circuit. The court will therefore approve the settlement. For reasons set out at length below, the court will award plaintiffs' counsel an attorney fee of 30% of the *net* settlement fund. The court will also reimburse plaintiffs' counsel for their reasonable out-of-pocket litigation expenses in the amount of $86,801.68. Finally, the court will award each named plaintiff $1,000 from the settlement fund for their efforts on behalf of the class.

### THE UNDERLYING ALLEGATIONS

Defendant National Media Corp. ("National Media") is a leading worldwide marketer of consumer goods. In December 1993, ValueVision International, Inc. ("ValueVision") began purchasing large blocks of National Media stock, and by the end of the month had acquired a 9.8% stake in National Media. On January 13, 1994, ValueVision submitted a proposal to National Media's board of directors to purchase up to 50.1% of National

Media's stock. The following day, National Media's board of directors refused ValueVision's offer, and issued a press release justifying its refusal to negotiate with the representatives of ValueVision. The press release emphasized National Media's strong prospects for growth and success in the future.

Undeterred, ValueVision commenced a hostile takeover attempt in February 1994, seeking to purchase 5,825,000 shares of National Media stock at $10.50 per share. On March 7, 1994, however, the two companies reached terms and the hostile takeover was terminated. National Media announced a merger agreement valued at over $150 million. ValueVision agreed to offer $11.50 in cash per share for all outstanding National Media stock.

In another turn of events, however, ValueVision backed out of the merger on April 21, 1994, alleging that National Media had failed to meet its obligations under the merger agreement by making inaccurate representations and warranties.

National Media's response to the failed ValueVision takeover constitutes the basis for this lawsuit. On April 25, 1994, defendants filed a Form 8–K with the SEC and simultaneously released a press release stating that National Media planned to file suit against ValueVision in connection with the failed takeover. The press release stated that ValueVision's allegations were "patently ridiculous" and that the real reason ValueVision backed out of the deal was its own inability to obtain financing. Plaintiffs allege that this statement was designed to instill public confidence in National Media's financial condition, and implicitly ensured the public that the stock was worth at least $11.50 per share—the price offered by ValueVision in the takeover. National Media continued to release positive statements about the company's prospects in light of the failed merger through the later part of April and into May 1994, including a statement that National Media planned to expand its operations to South America and Taiwan.

On June 29, 1994, however, National Media announced that it would be delaying the filing of its Form 10–K pending completion of negotiations for the acquisition of additional capital. The company also announced that it expected to report a loss of approximately $8.7 million for the previous year, but attributed the expected loss to "unusual charges" of approximately $9 million. Two weeks later, however, on July 15, 1994, the company announced that independent auditors would indicate on the company's Form 10–K that "negative cash flows and litigation raise substantial doubts as to the Company's ability to continue as a going concern." Upon this announcement, National Media stock declined 28.2% and closed at a low of $3.50 per share.

Plaintiffs allege that National Media and its directors knew of National Media's financial difficulties upon the failure of the merger with ValueVision, yet attempted to deceive the public into believing that the company was actually in sound financial condition. The class action complaint alleges that each of the positive statements following the failed ValueVision merger was calculated to maintain the stock price of National Media at an artificially inflated level, despite the fact that National Media and its directors knew of the problems which eventually led independent auditors to question whether the company could continue as a going concern. Furthermore, plaintiffs allege that the defendant directors capitalized on this artificially inflated stock price by selling large volumes of shares between the time of the failed merger and the announcement of National Media's financial woes in July of 1994.[1]

## PROCEDURAL HISTORY

On July 19, 1994, four days after the precipitous announcement that National Media's future as a going concern was uncertain, plaintiff Sandra Lachance ("Lachance"), filed the complaint in the instant matter, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), *as amended,* 15 U.S.C. §§ 78j(b) & 78t(a), seeking relief on her own behalf, and on behalf of a class consisting of all persons and entities who purchased the common stock of National Media during the period

---

1. National Media has since recovered from its financial difficulties.

from April 25, 1994 (the date of the 8–K filing and press release) through July 14, 1994 (the date of the "going concern" statement). The Philadelphia law firm of Spector & Roseman signed the complaint on behalf of Lachance, while three other law firms were named "of counsel;" Milberg Weiss Bershad Hynes & Lerach, Stull, Stull & Brody, and Abbey & Ellis.

A similar action was filed on November 8, 1994 by Bruce Efron and Philip Cohen, also seeking to recover on behalf of themselves and all others similarly situated. *See Efron v. Harrington*, Civ. No. 94–6800 (E.D.Pa. 1994). The complaint in that matter was filed by The Law Offices of Bernard M. Gross, P.C., another Philadelphia law firm. That case was consolidated with this action by order dated February 23, 1995.

On August 11, 1995, plaintiffs first moved for class certification. In response, defendants filed a cross motion for conditional class certification to which plaintiffs agreed by letter. In an order dated February 6, 1996, this court denied plaintiffs' and defendants' motions for class certification without prejudice to file a subsequent motion for class certification. Noting that the Court of Appeals for the Third Circuit has demanded that district courts must be especially vigorous in ensuring that all the requirements of Federal Rule of Civil Procedure Rule 23 have been met before certifying a class for settlement purposes, *see In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 794 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995), the court found that it did not have a sufficient factual record to "rigorously apply" those pre-requisites. *See Lachance v. Harrington*, Civ. No. 94–4383, 1996 WL 53801 at *2 (E.D.Pa. Feb.6, 1996).

Plaintiffs filed a second motion for class certification on March 11, 1996 which provided considerably more detail as to each of the prerequisites for class certification under Rule 23(a) and Rule 23(b)(3). The court carefully considered the evidence presented in favor of class certification, and in an opinion and order dated April 30, 1996, found that all the requirements of Rule 23(a) and Rule 23(b)(3) were satisfied. *See Lachance*

*v. Harrington*, Civ. No. 94–4383, 1996 WL 210806 (E.D.Pa. Apr. 30, 1996). The court therefore certified the following class:

> All persons and entities who purchased the common stock of National Media Corporation between April 21, 1994 and July 15, 1994, inclusive, excluding the defendants herein, members of the immediate families of defendants John J. Turchi, Jr., Mark P. Hershhorn and Kevin Harrington, subsidiaries and affiliates of National Media, and the legal representatives, heirs, successors, or assigns of any excluded party.

*See id.* at *5.

Before the parties even addressed the issues of class certification, class counsel and the defendants were busily negotiating a settlement. Settlement negotiations began in the fall of 1994 and, in April 1995, an agreement in principal had been reached. On November 20, 1995, the parties reduced their agreement to writing. Defendants, while denying any liability as to the underlying causes of action, agreed to pay $1.15 million into a settlement fund to be paid to class members. *See Stipulation and Agreement of Compromise and Settlement* at ¶ 2. In return, class members agreed to release the defendants from all future claims against defendants arising from the allegations in the class action complaint. *See id.* at ¶ 3. The agreement also stipulated that defendants would not contest that administrative expenses were to be paid out of the settlement fund, *see id.* at ¶ 5, and that plaintiffs' counsel would seek an attorney fee based on a percentage of the settlement fund. *See id.* at ¶ 6.

On July 23, 1996, plaintiffs moved the court for preliminary approval of the proposed settlement and for authorization to disseminate notice of the proposed settlement. The court held a hearing on August 8, 1996 regarding the propriety of preliminary approval of the proposed settlement, and in an order dated September 17, 1996, the court found that there were no obvious deficiencies in the proposed settlement, and therefore ordered preliminary approval of the class for purposes of disseminating notice pursuant to Federal Rule of Civil Procedure 23(e). In the order, a final hearing as to the fairness

and adequacy of the settlement was scheduled for January 24, 1997. The court approved the form of notice which included, *inter alia,* information regarding the amount of the settlement, notice that failure to opt out or object would bind the class members to release the defendants from any further liability, notice that class members must either opt out or file objections by January 3, 1997 and notice that class counsel reserved the right to claim up to 33⅓% of the gross settlement fund as an attorney fee. The court also ordered that class counsel file their brief in support of the settlement with the court by December 9, 1996, so that class members would have the opportunity to review the brief before the opt-out date of January 3, 1997. No objections have been filed and no class member has chosen to opt-out of the proposed settlement.

The court held a fairness hearing on January 24, 1997. The court is now prepared to rule on the fairness and adequacy of the settlement, and enter an appropriate order.

## DISCUSSION

### I. *Adequacy of Notice*

■ Before the court may delve into the merits of the settlement, it must first determine whether the class received adequate notice of the settlement. Federal Rule of Civil Procedure 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R.Civ.P. 23(e). Adequate notice of a proposed settlement which will fix the rights of class members who do not opt-out and forever bar them from seeking further relief on their causes of actions is required not only by the rules of civil procedure, but also by the constitutional mandate of due process. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811–12, 105 S.Ct. 2965, 2974–75, 86 L.Ed.2d 628 (1985); *Kyriazi v. Western Elec. Co.,* 647 F.2d 388, 395 (3d Cir.1981). In order to satisfy due process, notice to class members must be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and

afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

■ In a 23(b)(3) class action such as this one, the court is required to disseminate "to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2); *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 175–76, 94 S.Ct. 2140, 2151–52, 40 L.Ed.2d 732 (1974). In a security class action such as this one, individual notice is required to be disseminated to all class member shareholders who can be identified with reasonable effort. *See id.* at 177, 94 S.Ct. at 2152; *Steiner v. Equimark Corp.,* 96 F.R.D. 603, 614 (W.D.Pa.1983) (individual notice should be sent to shareholders in the corporation's records).

The court is satisfied that the notice provided to class members in this case meets the requirements of Rule 23(c)(2) and due process. The form of notice adequately advises class members of the nature of the action, their rights in the action, and that they will be bound by the judgment should they fail to exercise their option to opt-out of the class. *See* Fed.R.Civ.P. 23(c)(2); *Phillips Petroleum,* 472 U.S. at 812, 105 S.Ct. at 2974–75. The notice also advised class members of their right to object to the proposed settlement of the class.

■ The dissemination of notice also meets the requirements of Rule 23 and due process. Individual notice was sent to each record holder identified by National Media's transfer agent as having purchased stock during the class period. *See Mulholland Aff.* at ¶ 2; N.T. Jan. 24, 1997 at 10, 14. Additionally, notice was sent to the nation's 225 largest banks and brokerage companies, as well as 704 institutional investors. *See Mulholland Aff.* at ¶ 2. An additional 1,661 notices were sent to institutional groups and individual investors who later requested notice, presumably in response to the notice they had received from their bank or brokerage company. *See id.* at ¶ 5. The notice which was sent to record holders was calcu-

lated to ensure that proper notice would be sent to the beneficial owners of the stock. *See id.* at exh. B; N.T. Jan. 24, 1997 at 15. Finally, notice was disseminated through publication in the national edition of the *Wall Street Journal* on October 24, 1996. *See Mulholland Aff.* at ¶ 4. The court is therefore satisfied that class members received the "best notice practicable under the circumstances," including individual notice to "all class members who [could] be identified with reasonable effort." *Eisen,* 417 U.S. at 177, 94 S.Ct. at 2152.

## II. *Fairness, Reasonableness and Adequacy of the Settlement*

██ "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). However, having said this, our court of appeals has also concluded that when the lawyers for both sides have agreed on terms of settlement, the typical adversarial setting is distorted, *see id.* at 789, and the court must beware of the potential for collusion between class counsel and defense counsel which is contrary to the interests of the class members. *See id.* at 805 (noting that "[a] number of courts have recognized the need for a special focus on precluding the existence of collusion"); *id.* at 802 ("At worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorney's fees." (quoting John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions,* 86 Colum. L.Rev. 669, 714 n. 21 (1986))). Thus, both "[c]ourts and commentators have interpreted [Rule 23(e) ] to require courts to 'independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished.' " *General Motors,* 55 F.3d at 785 (quoting 2 Herbert Newberg & Alba Conte, Newberg on Class Actions § 11.41, at 11–88

to 11–89 (3d ed.1992)). In sum, "the court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *Id.* (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)); *see Lake v. First Nationwide Bank,* 900 F.Supp. 726, 732 (E.D.Pa.1995).

In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975), our court of appeals provided district courts with a list of factors to consider in determining whether a settlement under Rule 23(e) is fair, reasonable and adequate to the class:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 157.

██ Additionally, the court of appeals emphasized in *General Motors* that there are "special difficulties the court encounters with its duties under Rule 23(e) in approving settlements where negotiations occur before the court has certified the class." *General Motors,* 55 F.3d at 805. In such cases the court must be "even more scrupulous than usual in approving settlements . . . ." *Id.*

The settlement in this case was negotiated and finalized in November of 1995, approximately six months before the court certified the class on April 30, 1996. Thus, the court recognizes that under *General Motors,* it

must be especially diligent to ensure that class counsel have adequately protected the interests of absentees.

After careful application of the *Jepson* factors to the facts of this case, the court concludes that the settlement proposed by class counsel is fair, reasonable and adequate. The case is made much closer by the exacting scrutiny required by the court of appeals in *General Motors*, especially when the facts before the district court in this case are compared to the facts presented to the district court in *General Motors*. Even under the stringent standard set out in that opinion for the approval of settlements in class action law suits, however, the court believes it is appropriate to approve the settlement in this case, especially if the law is to continue supporting early resolution of litigation through settlement. *See Williams v. First Nat'l Bank of Pauls Valley*, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910) ("Compromises of disputed claims are favored by the courts. . . .")

### A. The Value of the Settlement to the Class Members

If courts are to encourage and favor settlements, at the end of the day the best any court can do for absentee class members in a class action seeking damages, such as this one, is to ensure that they are receiving settlement commensurate with the value of their stake in the litigation. Thus, the most important factor in evaluating whether a settlement is fair, reasonable and adequate is the value of the settlement to the class. *See Petruzzi's, Inc. v. Darling–Delaware Co., Inc.*, 880 F.Supp. 292, 296 (M.D.Pa.1995); Richard L. Marcus & Edward F. Sherman, Complex Litigation 535 (2d ed.1992).

As Chief Judge Posner has stated, "[a] settlement is fair to the plaintiffs in a substantive sense . . . if it gives them the expected value of their claim if it went to trial." *Mars Steel Corp. v. Continental Ill.*

*Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677, 682 (7th Cir.1987). Our court of appeals, appears to agree: "in cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *General Motors*, 55 F.3d at 806 (citing Manual on Complex Litigation Second § 30.44, at 252 (1985)). The reasonableness of a settlement, therefore, can be reduced to the following formula to make an estimate of the reasonableness of settlement:

> likelihood of establishing liability × expected damages (maximum recoverable damages × likelihood of recovering maximum damages in the event liability is established) <> proposed settlement figure.[2]

The court will address these factors in turn.

#### 1. Likelihood of Establishing Liability

If settlement is to have any utility toward reducing the burden litigation places on the courts and litigants, the court must guard against conducting a mini-trial on the merits in order to determine the plaintiffs' likelihood of establishing liability. *See Fickinger v. C.I. Planning Corp.*, 646 F.Supp. 622, 630 (E.D.Pa.1986); *see also Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir.1974). Thus, the court must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action. *See Lake*, 900 F.Supp. at 732 ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'" (quoting *Austin v. Pennsylvania Dep't of Corrections*, 876 F.Supp. 1437, 1472 (E.D.Pa. 1995))).

---

2. Such a formula captures several of the Jepson factors: factor four (the risks of establishing liability), factor five (the risks of establishing damages), factor eight (the range of reasonableness of the settlement fund in light of the best possible recovery) and factor nine (the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation). The court of appeals appears to accept the consolidation of these factors into one inquiry. *See General Motors*, 55 F.3d at 806.

At the hearing held on August 8, 1996, plaintiffs' counsel Eugene Spector, Esq., posited that the likelihood of plaintiffs' being able to prove liability was somewhere in the range of 40%. *See* N.T. Jan. 24, 1997 at 45. At the final hearing held on January 24, 1997, however, class counsel Stephen Schulman, Esq., certified to the court that, in his opinion, the probability of success on liability was more in the range of 20% to 30% *See id.* at 47. The bulk of the hours billed in this case were expended by Mr. Schulman's firm, and all counsel agree that he is the most knowledgeable attorney with regard to the case. In any event, all class counsel agree the likelihood of success is in the range of 20% to 40%. Taking middle ground, the court will credit class counsel with a 30% estimation of the likelihood of establishing liability.

The *General Motors* decision, however, concluded that the court may not simply rely on class counsel's estimation of the value of the case. *See General Motors*, 55 F.3d at 814–16 (district court abused its discretion in agreeing with class counsel's contention that serious statute of limitation problems and varying issues of state law, *inter alia*, created a substantial risk in establishing liability and therefore weighed in favor of approving the settlement).[3] Therefore, the court will seek to determine whether this 30% estimate is a reasonable evaluation of the plaintiffs' likelihood of establishing liability. The court need not, and cannot, determine a figure with mathematical certainty. Rather, the court will analyze the case to determine whether plaintiffs' *estimation* is a reasonable one.

**3.** The court of appeals in *General Motors* found that the district court abused its discretion when it determined that variations in state law cut in favor of settlement because of the difficulty of proving liability and the difficulty of maintaining class status, *see General Motors*, 55 F.3d at 815 (variations in state law do not prevent maintenance of a class action). Curiously, the court in *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 627 (3d Cir.), *cert. granted,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996) found that variations in state law regarding asbestos injuries cut against class certification. *See id.* at 618.

**4.** Section 10(b) of the Exchange Act provides:

### a. Merits of the Case

It appears that the claims stated in plaintiffs' class action complaint state a viable cause of action under § 10(b) of the Exchange Act.[4] Rule 10b–5, promulgated under the authority of § 10(b), prohibits the making of "any untrue statement of material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b–5. In order to prove a violation of § 10(b) and Rule 10b–5:

a plaintiff must prove that defendant i) made misstatements or omissions; ii) of a material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the plaintiff relied; and vi) that reliance proximately caused the plaintiff's injury.

*In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989).

Plaintiffs' complaint alleges that defendants intentionally made false statements as to the company's financial condition following the failure of the ValueVision merger in order to artificially inflate the value of National Media's stock, and that the class members relied on these statements to their financial detriment. The court believes that such allegations would likely withstand a motion to dismiss. *See Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280–84 (3d Cir.) (corporations false and misleading statements as to company's financial condition actionable if knowingly or recklessly made), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). As the discussion below will indicate, however, the plaintiffs would have had to overcome several strong defenses to survive summary judgment in this case, and then still establish liability to a jury.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—to use of employ, in the connection with the purchase or sale of any security registered on a national exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

### i. *Did the Defendants Make Misstatements?*

As an initial matter, to the extent that plaintiffs allege violations of the securities laws based on affirmative misrepresentations, plaintiffs must show that the statements made by the defendants were in fact false or misleading. Plaintiffs' argument is that National Media was already in poor financial condition when ValueVision backed out of the merger and this was the reason for the failed merger. Thus, they allege, the facts which led to the "going concern" statement made in July 1994 were already in existence at the time of the failed merger, and that defendants' statements assuring that the company was in a good financial condition were false and misleading in light of this information.

Class counsel discovered during depositions, however, that when the first statements in question were made in late April, 1994, there was in fact nothing seriously wrong with National Media's financial condition. Indeed, it was apparently not until June of 1994 that National Media discovered that one of its prime lenders was reluctant to continue to extend a $5 million line of credit in the wake of the failed ValueVision merger. *See Schulman Aff.* at ¶ 38. National Media would argue that the only reason it was required to report a loss on its Form 10–K was because of its potential loss of this line of credit, not because of any poor financial condition at the time of the failed merger. Thus, the April statements were arguably true when made.

Further, when the company first announced that it would be suffering an $8 million loss due to "unusual charges" on June 29, 1994, this statement was arguably true, as the defendants had just learned that National Media would be unable to obtain the $5 million line of credit, and the defendants had suffered certain one time fees such as moving the company fulfillment center to Arizona. *See id.* at ¶ 45. Such charges may fall within the definition of "unusual charges." At this time National Media was also negotiating a possible $5 million inflow of capital from QVC Corporation. *See id.* at ¶ 44. The QVC deal fell through, but only after the June 29 statement that the losses were due to "unusual charges." Defendants would argue that when the July 1994 "going concern" statement was made it was a result of developments which occurred after the last statements they made regarding the company's financial condition—the failure of the QVC capital inflow. Therefore, each of the statements in April, June and July could be viewed as accurately reflecting the financial condition of National Media at the time it was made.[5]

Finally, defendants would argue that their statements regarding the company's future prospects were in fact accurate, as the company recovered from its troubles in the summer of 1994 and is currently in good financial health. In light of all the foregoing, it is clear the defendants would have had substantial difficulty establishing that the statements made by National Media were in fact false or misleading.

### ii. *Were the Misstatements Material?*

█ Even if the statements were false or misleading, the court believes plaintiffs would have some difficulty showing that the statements or omissions were material. A statement or omission is material if a reasonable investor would consider it important in deciding whether or not to buy the security. *See Shapiro*, 964 F.2d at 282 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (materiality in the context of a violation of § 14(a) of the Exchange Act)); 2 Thomas L. Hazen, The Law of Securities Regulation § 13.5A, at 508 (3d ed.1995).

The alleged misstatements and omissions in this case involve, to a large extent, management's predictions as to the future performance of National Media. While our court of appeals has suggested that a reasonable investor is entitled to take "a manager's statement of belief at ... face value," *Shapi-*

---

**5.** As discussed below, each of these arguments would also be raised to show defendants lacked scienter—to the extent that this information indicates that the company was in good financial condition, even if in fact it was not, the information shows that defendants may have had a reasonable basis for believing their statements were in fact true when made.

*ro*, 964 F.2d at 282, it is also clear that "where an event is contingent or speculative in nature, it is difficult to ascertain whether the reasonable investor would have considered the ... information significant at that time." *Id.* at 283 (quoting *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 643 (3d Cir.1990)). Thus, it is not entirely clear that a mere prediction or projection by management as to a company's future prospects will be considered material. *See Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir.1994) (holding that predictions as to *future* company performance are actionable "only if they are supported by specific statements of fact or are worded as guarantees"); *see also Kline v. First Western Gov't Sec., Inc.*, 24 F.3d 480 (3d Cir.) (discussing the "bespeaks caution" doctrine), *cert. denied sub nom. Arvey, Hodes, Costello & Burman v. Kline*, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994).

Further, the SEC has "indicated its decision to encourage the disclosure of projections and other forward-looking statements." 2 Hazen, *supra*, § 13.5A, at 521. Given the SEC's encouragement of the use of foreword looking statements, courts should be cautious to alter the "traditional rule that statements of opinion will not, without more, form the basis of a misrepresentation claim," *id.* at 522, to avoid forcing defendants to navigate the Scylla of following SEC's rules of disclosure and the Charybdis of Rule 10b–5 liability for predictions which turn out to be inaccurate.

 Many of the alleged misstatements in this case were essentially predictions as to how National Media would perform after the collapse of the ValueVision merger. Defendants could have argued that these statements were mere speculation or "puffery," and no reasonable investor would consider such statements of opinion material in deciding whether to purchase National Media stock. The court need not now decide

whether the statements made by the defendant as to National Media's prospects after the failed ValueVision merger were in fact material. It is enough to say that, in light of the foregoing, a substantial question as to plaintiffs ability to show materiality exists.[6]

### iii. *Did the Defendants Act with Scienter?*

 Plaintiffs would also have had some difficulty proving scienter in this case. In order for plaintiffs to recover, they must show that "the defendant lacked 'a genuine belief that the information disclosed was accurate and complete in all material respects.'" *Phillips Petroleum*, 881 F.2d at 1244 (quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979)). In our circuit, scienter may also be shown by proving "an extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must be aware of it." *Id.* (quoting *Healey v. Catalyst Recovery of Pa., Inc.*, 616 F.2d 641, 649 (3d Cir.1980)).

Plaintiffs' strongest evidence to show scienter is that the defendants are accused of selling large volumes of stock during the period of alleged stock price inflation. If the information disseminated by the defendants was false and misleading, the fact that they sold their own stock during the period would be a strong indication that they knew that the stock price was artificially high and took advantage of the inflation by selling at the artificial price. Defendants will argue, however, that there was no significance to their sale of stock—that it was a mere coincidence. *See* N.T. Jan. 14, 1997 at 33–34. More importantly, as discussed above, they have significant evidence to show that the statements they made to investors were, in fact an accurate representation based on the information available to them at the time the statements were made. Therefore, even if the statements were in fact "false," defendants have

---

6. In this circuit, "an opinion or projection, like any other representation, will be deemed untrue for purposes of the federal securities laws if it is issued without reasonable genuine belief or if it has no basis." *Kline*, 24 F.3d at 486 (quoting *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 184 (3d Cir.1988), *cert. denied*, 489 U.S. 1054,

109 S.Ct. 1315, 103 L.Ed.2d 584 (1989)). Although plaintiff may have been able to escape summary judgment on this issue, it would still be quite difficult to convince a jury that a *reasonable* investor would attach importance to optimistic statements made by management, rather than deem such statements mere puffery.

more than an arguable claim that they at least had a reasonable basis to believe the statements were accurate.

### iv. *Did the Plaintiffs Rely on the Misstatements?*

 In order to prove reliance, the plaintiffs would be required to rely on the "fraud on the market" theory approved of by the Supreme Court in *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Id.* at 241–42, 108 S.Ct. at 989.

 This theory creates a rebuttable presumption that a given plaintiff has relied on the material misstatement in purchasing or selling his security. *See id.* at 247, 108 S.Ct. at 991–92. The presumption may be rebutted, however. *See id.* at 248–49, 108 S.Ct. at 992–93. If defendants are able to show that the market for National Media stock was inefficient, such that information would not be disseminated in the open market, or that the true information actually leaked into the market, the fraud on the market theory would be rebutted and each plaintiff would be required to show individual reliance. *See id.*

The court does not have sufficient information to determine whether plaintiffs present a strong case for a fraud on the market theory in this case. While it may be difficult to rebut the fraud on the market theory in the open market context, *see* Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 1057 (3d ed.1995), the defendants would certainly attempt to do so. While there is reason to believe plaintiffs would have been successful in establishing the

fraud on the market theory, *see In re ValueVision Int'l Inc. Sec. Litig.,* 896 F.Supp. 434, 447–48 (E.D.Pa.1995) (in litigation related to this case, Judge Pollack concluded fraud on the market theory was applicable to trade of National Media stock), it cannot be said conclusively that plaintiffs would prevail on this issue.[7]

### b. Class Counsel's Estimation of Establishing Liability is Reasonable

In light of the foregoing analysis, the court concludes that class counsel's estimation that the class stands an approximately 30% likelihood of establishing liability appears reasonable. Indeed, the real number may be lower. The plaintiffs would have special difficulty in proving that the statements made by defendants were either false or misleading. Even if they can prove the statements were in fact inaccurate, plaintiffs will have difficulty proving that defendants knew the statements were false or misleading and that such statements were material. Even if the plaintiffs had survived summary judgment, they would have had to convince a jury on each of these complex issues—not an easy task. *See Fickinger,* 646 F.Supp. at 628–29. Given these uncertainties in the plaintiffs' claims for liability, the court believes that a 30% chance of establishing liability is reasonable, if not optimistic.

### 2. *Expected Damages Should Liability Be Established*

#### a. Maximum Recoverable Damages

Plaintiffs' expert in this case has opined that he believes the maximum possible damages plaintiff could establish would be in the range of $5.5 to $6 million. *See Pl.'s Mem. of Law in Support of Proposed Settlement* at 23; N.T. Jan. 24, 1997 at 45. The defendants have not objected to the qualifications of plaintiffs' expert and there appears to be no reason why the expert would not be entitled to testify at trial. Nor do the defendants dispute the fact that plaintiffs' expert would

---

7. As to the other two elements of a 10b–5 cause of action, the court believes plaintiffs could establish that the sale was "in connection with the sale or purchase of a security," as each of the plaintiffs purchased stock during the period in question. *See generally Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The issue of damages is taken up below.

estimate the maximum recoverable damages as falling in the range of $5.5 to $6 million. Thus, the court accepts the figure of $6 million as the maximum possible recovery should liability be established.

b. Likelihood of Establishing Damages

At the fairness hearing held on January 24, 1997, defendants seemed to indicate that they would present expert testimony at trial that plaintiffs' damages were, in fact, zero. *See id.* at 93. Thus, there is no doubt that the measure of damages would have been fiercely contested at trial. "The measure of actual damages in a section 10(b) action is the out-of-pocket loss measured by the difference between the fair value of what the plaintiff received and the fair value of what he would have received had there been no fraudulent conduct." *Torres v. Borzelle-ca,* 641 F.Supp. 542, 544 (E.D.Pa.1986) (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972)). In other words, in order to establish damages, a plaintiff must show that the defendants' conduct caused the decline in value of his or her stock.

If the case were to go to trial, there is no doubt that defendants would introduce expert testimony to attempt to show that, even if the defendants made misleading statements, those statements did not affect the value of National Media's stock. As Professor Hazen has noted:

> When dealing with publicly-traded securities, many factors exist during the period in which violations take place which may affect the market price of the securities. These factors include general market or financial conditions, industry-wide conditions or issuer problems unrelated to the violations in question. In these situations, the courts try to establish the value of the defendant's misrepresentation. Where market factors change over the period of the fraud, or where there are plaintiffs who, because of the time of the acquisition of their securities, are in different damage positions, the value of the misrepresentations may vary.

2 Hazen, *supra,* § 13.7, at 559.

Once again, the court will not attempt to speculate as to the exact details which may have affected the market price of National Media stock during the class period. Defendants' counsel certified to the court in oral argument that he feels defendants have a very strong case for showing that the plaintiffs suffered no damages. *See* N.T. Jan. 24, 1997 at 93–94. Class counsel have expressed considerable doubt as to their ability to establish the full amount of damages. *See id.* at 45. In the end, the question would come down to a battle of the experts—testimony which makes it "hazardous to predict how much of a financial recovery the jury would award...." *Pozzi v. Smith,* 952 F.Supp. 218, 223–24 (E.D.Pa.1997). From all the information presented to the court, it appears that the plaintiffs stand at best an approximately 50% chance of establishing their full measure of damages. *See* N.T. Jan. 24, 1997 at 93 (class counsel estimated probability of recovering maximum damages at 50%).

3. *The Value of the Settlement Fund in Light of the Expected Recovery*

The court now has the necessary elements to determine the expected value of the settlement and compare that value to the settlement proposed by counsel. The court has determined that the plaintiffs have about a 50% chance of establishing their maximum damages of $6 million. Thus, the expected damages are $3 million ($6 million × 50%). To determine the expected value of the settlement, the court must multiply the expected damages, $3 million, with the probability of establishing liability, 30%. Under this formula, the court concludes that the expected value of the settlement is approximately $900,000.

The settlement offered in this case amounts to $1.15 million. The court believes that such a settlement offers a fair recovery in light of what the plaintiffs might have expected had they gone to trial. Although the calculation of the expected value of the settlement can only be an estimate, the estimate in this case is well within the range of that which the plaintiffs are actually receiving. By settling the plaintiffs also gain the benefit of receiving their money immediately, rather than waiting for what might be years before the litigation is actually concluded,

and after which significantly more costs may be incurred. *See R.K. Greenfield v. Footwear Investors, Inc.,* Civ. No. 84–5472, 1986 WL 10806 at *2 (E.D.Pa. Sep. 30, 1986). Finally, the risk of going to trial is itself a cost to a risk averse plaintiff, and thus the value of settling rather than going to trial may itself yield substantial benefits to the class members. *See Mars Steel Corp.,* 834 F.2d at 682.

In light of all the foregoing, the court concludes that the plaintiffs are receiving a valuable settlement—indeed, a settlement which is even more valuable than what they might have expected had the case gone to trial. While the court must also consider the remaining *Jepson* factors before declaring the settlement fair, adequate and reasonable, I believe that the value of this settlement should be given substantial weight.

### B. State of Proceedings and Adequacy of Discovery

While the value of the settlement in light of the information presented to the court thus far weighs heavily in favor of approving the settlement, the one factor which weighs against settlement is the adequacy of discovery. In *In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.,* 846 F.Supp. 330 (E.D.Pa.1993), *rev'd,* 55 F.3d 768 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995), the district court concluded that the stage of proceedings and discovery weighed in favor of settlement. *See id.* at 334–35. In that case, class counsel, although agreeing to a settlement eight months after the first suit had been filed, had reviewed over 300,000 documents, over 100 volumes of deposition testimony, numerous volumes of trial testimony from a previously litigated case involving the same issues and several dozen videotapes of testimony and crash testing. *See id.* at 334. Counsel had also reviewed numerous records from federal safety tests. *See id.* Despite this apparently extensive discovery, however, the court of appeals held that the court abused its discretion in finding that sufficient discovery had taken place to weigh in favor of approving the settlement. *See General Motors,* 55 F.3d at 813–14.

The discovery performed in this case pales in comparison to the discovery which had taken place in the *General Motors* case. Here, plaintiffs have conducted only two depositions. In *General Motors,* plaintiffs' counsel had reviewed over 100 volumes of depositions. *General Motors,* 846 F.Supp. at 334. In this case plaintiffs reviewed preliminary document production before reaching a settlement. *See* N.T. Jan. 24, 1997 at 21–24. In *General Motors,* plaintiffs' counsel reviewed over 300,000 documents. *See General Motors,* 846 F.Supp. at 334. Finally, while the court believes that the defendants have gleaned substantial information from the two related suits involving the same issues in this case, the court of appeals in *General Motors* did not consider it sufficient that plaintiffs' counsel had access to a prior products liability action involving the same issues presented in that case. *See General Motors,* 55 F.3d at 813–14. Thus, the court must conclude that the stage of proceedings in this case weighs against settlement.

Nevertheless, the court hopes that *General Motors* does not preclude settlement unless massive discovery has taken place prior to the settlement decision. One of the major reasons courts encourage settlement is to reduce the cost of litigation, a factor strongly favored by Congress. *See* Civil Justice Reform Act of 1990, 28 U.S.C. § 471, *et seq.*

While the discovery in this case was relatively sparse, the discovery which was performed yielded valuable information relating to the defendants' likely defenses. Because this case turns largely on the financial condition of National Media, it is appropriate that class counsel focused on discovery of documents which would shed light on National Media's value at the time the statements were made. Further, the defendants deposed knowledgeable personnel from National Media who were able to outline the likely defenses which would be raised at trial. From this information, class counsel and the court were able to discern that there are serious weaknesses in the plaintiffs' case. While class counsel should generally conduct more discovery than was conducted in this case, the court concludes that this factor

alone does not outweigh the weaknesses which are apparent in the plaintiffs' case.

### C. The Lack of Objection From Class Members

■ Despite the more than adequate notice which was sent to class members, not one class member has either opted out or objected to the proposed settlement. Before 1995, this court would have been of the view that "this unanimous approval of the proposed settlement by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *Fickinger,* 646 F.Supp. at 631 (quoting *In re Art Materials Antitrust Litig.,* 100 F.R.D. 367, 372 (N.D.Ohio 1983)); *see also Lake,* 900 F.Supp. at 732 ("[T]he low number of objections or requests for exclusion bolsters the contention that this is not an unreasonable settlement."). Generally, if the class members do not oppose the class settlement, the court is justified in concluding that they consider it fair and reasonable. *See id.; Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1313–14 & n. 15 (3d Cir.1993).

In *General Motors,* however, the district court was faced with a proposed settlement class action in which only 5,203 class members, out of a class of 5.7 million, chose to opt out—less than one-tenth of 1%. An additional 6,450 owners objected to the settlement, just over one-tenth of 1% of the class. *See General Motors,* 846 F.Supp. at 334. Nevertheless, the court of appeals held that it was an abuse of discretion to find that this factor weighed in favor of settlement. *See General Motors,* 55 F.3d at 812–13. The court of appeals was apparently concerned with drawing inferences from class silence in cases where class members "have an insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's pro rata benefit." *Id.* at 812 (quoting *Bolger,* 2 F.3d at 1313 n. 15). Additionally, the court of appeals noted that "those who did object did so quite vociferously...." *Id.* at 813.[8]

The court must assume that these were legitimate concerns in the *General Motors* settlement. Nevertheless, they certainly have no application to this case. Even if some of the class members had small stakes which undermined their incentive to object to the settlement in this case, large quantities of National Media stock were in the hands of institutional investors who certainly had sufficient incentive to object to the settlement if they found it to be unfair or unreasonable. Further, there are *no* objections in this case, thus there can be no individual objections to rise to the level of "vociferous." Thus, the court concludes that, even in the wake of *General Motors,* the fact that there have been no objections whatsoever in this case weighs in favor of settlement.

### D. Remaining Factors the Court Should Consider

At least two other factors weigh in favor of approving the settlement in this class action. First, the court concludes that the negotiations here took place at arms length. *See General Motors,* 55 F.3d at 814. The transcript of the fairness hearing clearly demonstrates that the negotiations process was hard fought and the adversarial process was vigorously maintained. *See, e.g.,* N.T. Jan. 24, 1997 at 18, 84. Second, class counsel in this case were extremely experienced in securities class action litigation and have used that experience toward an adequate prosecution on behalf of the class in this case. *See General Motors,* 55 F.3d at 800.

The remaining factors weigh neither in favor of settlement nor against settlement. First, it is certainly true that class action litigation under the federal securities laws involves complex issues which are costly to resolve and often result in protracted proceedings. *See Footwear Investors,* 1986 WL 10806 at *2. Of course, all class action law suits involve complex issues, which are costly to resolve and often result in protracted proceedings. Neither class counsel nor defense counsel suggests that this case involves unique issues of law or unusual factual pat-

---

**8.** The court of appeals also concluded, without further explanation or reference to the record, that "the appeals of those who actually objected demonstrate that the reaction of the class was actually negative, and not supported by 'the vast majority of the class members' as the district court concluded." *General Motors,* 55 F.3d at 813.

terns unique among litigation under the securities laws. The court therefore concludes that this factor does not weigh strongly in favor of settlement. However, to the extent that the factor is "intended to capture 'the probable costs, in both time and money, of continued litigation'," *General Motors*, 55 F.3d at 812, the early resolution of this case certainly cannot be said to weigh against settlement either. Thus, the court concludes that this factor is not particularly helpful in this case.

Second, the court sees no reason to believe that the plaintiffs will have difficulty maintaining the class through trial. While a risk that plaintiffs may not be able to maintain the class through trial should cut in favor of settlement, the court perceives no reason why the likelihood of maintaining class status through trial should cut against settlement.

Finally, the parties have presented the court with no evidence as to whether National Media could withstand a greater judgment. It does not appear that the matter was ever seriously considered in the negotiations in this case. Further, given the court's estimate of the value of the case in relation to the settlement offered, the court would give little weight to this factor even if it did weigh against settlement.[9]

### E. Summary

In conclusion, it appears to the court that the settlement is fair, adequate and reasonable. The court has given special weight to the value of the settlement. It appears that the class members are receiving a settlement which is not only commensurate with their expected recovery should the case go to trial, but perhaps even in excess of that expected recovery. While it would have been desirable for the plaintiffs to have conducted more discovery, the court believes that sufficient discovery was performed to conduct a rea-

sonable evaluation of the merits of the claim. It is unlikely that further discovery would have revealed any information which would have increased the likelihood of recovery to a degree which would make the settlement unfair.[10] The court will therefore approve the proposed settlement.

### III. *Attorney Fees and Expenses*

#### A. Attorney Fees

■■■ "[A] thorough judicial review of fee applications is required in all class action settlements." *General Motors*, 55 F.3d at 819. Class counsel in this case have requested a fee constituting 30% of the gross settlement fund including accrued interest as of January 23, 1997 totalling $349,469.25.[11] For the reasons set forth below, the court will award class counsel 30% of the net settlement fund—the gross settlement fund minus the out-of-pocket litigation expenses claimed by the defendants—totalling $323,428.75.

■■ It is well established that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). This "common fund doctrine" is founded upon principles of equity—"persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Id.; see also* Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 Cornell L.Rev. 656 (1991) (arguing that recovery of attorney fees from a common fund is based on principles of restitution). It is thus beyond question that class counsel in this case are entitled to a reasonable fee to be deducted from the settlement fund for the benefit

---

9. While courts must also be wary of protecting sub-classes by being "sold out" by a settlement, *see* Roger C. Cramton, *Individualized Justice, Mass Torts, and "Settlement Class Actions"*, 80 Cornell L.Rev. 811, 826–28 (1995), there are no sub-classes requiring protection in this case.

10. Even if the court assumes that discovery showed a greater likelihood of recovery, to say 40% and a greater likelihood of receiving the full amount of damages, to say 60%, the settlement

would still be well in the range of reasonableness as the expected value of the case would be approximately $1.44 million.

11. Plaintiffs' counsel agreed to fix the gross settlement's value for purposes of awarding attorney fees at $1,164,897.50—the value of the settlement fund on January 23, 1997. *See* N.T. Jan. 24, 1997 at 57.

they have bestowed upon the class members. *See General Motors,* 55 F.3d at 819–22.

■ The Third Circuit was the pioneer in the use of the "lodestar approach" for calculating attorney fees. *See Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973) ("Lindy I"), *appeal after remand,* 540 F.2d 102 (3d Cir.1976) ("Lindy II"). Under the lodestar approach, the court determines attorney fees by multiplying the number of hours spent on the litigation by an appropriate hourly rate. *See id.* In recent years, however, the lodestar approach has come under increasing criticism. *See, e.g., Report of the Third Circuit Task Force, Court Awarded Attorney Fees,* 108 F.R.D. 237 (1985) [hereinafter *"Task Force "*]; 2 Alba Conte, Attorney Fee Awards § 2.07, at 48–50 (2d ed.1993). Among the problems with the lodestar approach is its tendency to encourage lawyers to run up substantial legal bills in order to maximize their recovery from the common fund, *see Task Force,* 108 F.R.D. at 247–48 (*"Lindy* encourages lawyers to expend excessive hours, and in the case of attorneys presenting fee petitions, engage in duplicative and unjustified work .... "), and the massive burden it places on trial courts in sifting through attorney fee petitions to determine which costs are and are not justifiable. *See id.* at 246 (*"Lindy* increases the workload of an already overtaxed judicial system.").

■ The Percentage of Recovery ("POR") method of calculating attorney fees stands in contradistinction to the lodestar method. Under this approach, the court awards class counsel a percentage of the settlement fund. *See J/H Real Estate Inc. v. Abramson,* 951 F.Supp. 63, 64–65 (E.D.Pa. 1996) (Bartle, J.); Manual on Complex Litigation Third § 24.121, at 187–90 (1995). Despite the continuing validity of the lodestar method for statutory fee cases in our circuit, the court of appeals has now made it clear that district courts should apply the POR method of calculating fees in common fund cases such as this one. *See General Motors,* 55 F.3d at 821–22. The POR method of computing fees is thought to be superior because "it apportions the funds between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure." *Id.* at 821. Unlike the lodestar method which can encourage class counsel to devote unnecessary hours to generate a substantial fee, under the POR method, "[t]he more the attorney succeeds in recovering money for the client, and the fewer legal hours expended to reach that result, the higher dollar amount of fees the lawyer earns...." 1 Conte, *supra,* § 1.08, at 15. Thus, one of the primary advantages of the POR method is that it is thought to equate the interests of class counsel with those of the class members and encourage class counsel to prosecute the case in an efficient manner. *See id.* § 1.09, at 16 ("As in individual contingent fee practice, both the class and class counsel have the same economic motives.")

While the court of appeals has made it clear that the POR method is appropriate for common fund cases, it has not yet had occasion to decide whether the court should award that percentage based on the gross settlement fund, or whether the court should first deduct the costs of litigation before calculating the percentage of the fund to which counsel are entitled. Although most courts seem to apply the POR methodology to the gross settlement fund, *see id.* § 2.08, at 51 & n. 133, this court agrees with the courts which have found that the most appropriate method of calculating the POR is on the net settlement fund. *See In re Immunex Sec. Litig.,* 864 F.Supp. 142 (W.D.Wash.1994); *Wells v. Dartmouth Bancorp, Inc.,* 813 F.Supp. 126, 129 (D.N.H.1993); *Morganstein v. Esber,* 768 F.Supp. 725, 727 (C.D.Cal. 1991); *Levit v. Filmways, Inc.,* 620 F.Supp. 421, 426 (D.Del.1985); *see also In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 504 (N.D.Miss.1996) (calculating attorney fees as percentage of net settlement amount).[12]

---

12. The Eastern District of Texas has also adopted this approach:

Expenses incurred by attorneys that are directly related to the costs of litigation of individual cases shall be deducted from the award or settlement before any calculation or distribution is made for attorneys' fees.

If one of the primary purposes of using the POR method is to stimulate class counsel's incentives toward efficient prosecution of class actions, *see* Coffee, *Understanding the Plaintiff's Attorney*, 86 Colum. L.Rev. at 677–78 (suggesting that in order to create an optimal fee formula, the court must understand the incentives of plaintiff's lawyer), it is appropriate to base class counsel's fee on the net settlement fund. When litigation expenses are awarded in addition to a percentage on the gross settlement fund, the only incentive for plaintiff's counsel to minimize the costs of litigation is the subsequent court review for the reasonableness of the expense request. By making the amount of the fee dependent on the net recovery of the class, however, the costs of litigation are incorporated into the class counsel's incentive structure in pursuing the litigation. *See Immunex Sec.*, 864 F.Supp. at 145 (noting that awarding funds based on the net recovery encourages the class counsel to control expenses); *Levit*, 620 F.Supp. at 426 ("This technique provides counsel with the proper incentives in incurring expenses . . . ."); *accord Wells*, 813 F.Supp. at 129. Plaintiff attorneys who know that their fee will be based on the net recovery of the class, rather than the gross settlement, will have an incentive to keep costs to a minimum in order to maximize not only the class' return, but also their own attorney fee award.

By giving the plaintiff's attorney an incentive to minimize costs, the burden on the court is also lessened. The process of assessing attorney requests for fees is burdensome and, to a large extent, wasteful of court resources. *See Hensley v. Eckerhart*, 461 U.S. 424, 442, 103 S.Ct. 1933, 1944, 76 L.Ed.2d 40 (1983) (Brennan, J., concurring and dissenting) (noting that attorney fee litigation is "one of the least socially productive types of litigation imaginable"). Under the net recovery method, however, the court can be more confident that attorneys will not engage in wasteful and expensive pursuits such as excessive document duplication, inefficient use of expensive research techniques such as WESTLAW or LEXIS, *see Wehr v. Burroughs Corp.*, 619 F.2d 276, 285 (3d Cir. 1980) (computerized research recoverable if reasonable); *Pozzi*, 952 F.Supp. at 226–27 (accord), or unnecessary travel expenses. *See J/H Real Estate Inc.*, 951 F.Supp. at 65–66 (disallowing certain travel expenses as unreasonable). The court will still be required to carefully analyze the price charged for such services to ensure that plaintiff's counsel is not attempting to increase the premiums charged on such expenses in order to recoup its losses in attorney fees. Nevertheless, court resources will be saved as the court can be more confident that the actual activities engaged in by class counsel are reduced to an efficient level.[13]

Class counsel in this case seek an award of 30% of the gross settlement fund. Were the court to award attorney fees based on the gross settlement fund, it would be more inclined to consider an award of 25% of the gross recovery.[14] The United States Court

---

*Civil Justice Expense and Delay Reduction Plan for the Eastern District of Texas*, at art. 5.

The court has been unable to find any opinions from the United States Courts of Appeal which have discussed the issue of awarding attorney fees on the gross settlement fund or the net settlement fund.

**13.** The court believes this is ordinarily a better approach to keep expenses in check than imposing an expense cap at the outset of the litigation. *See* Manual for Complex Litigation Third at 197 (1995) (suggesting court may institute a fee cap). Setting an expense cap at the beginning of the litigation requires the court to make its own judgment of the optimal expenses to be incurred in prosecution of the case. Giving class counsel an economic incentive to consider the costs as the litigation progresses, however, allows the class attorney to make a continuing evaluation of

the desirability of expending more funds in relation to the expected value of the ultimate common fund.

**14.** The court realizes that awarding attorney fees based on the net settlement fund may also create several undesirable incentives for class counsel. In an influential article, Professor Coffee has suggested that awarding attorneys fees based on a percentage of the common fund may undercompensate attorneys and create incentives for class counsel to settle the case prematurely. *See* Coffee, *Understanding Plaintiff's Attorneys*, 86 Colum. L. Rev. at 684–90.

Both of these problems are common to any attorney fee system which uses the percentage of recovery method. It appears, however, that awarding attorney fees based on the net settlement fund as opposed to the gross settlement

of Appeals for the Ninth Circuit has held that twenty-five percent of the common fund is a reasonable "benchmark" to use in common fund cases. *See In re Pacific Enter. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir.1995). District courts in this district have also employed the 25% benchmark figure for use in securities class action litigation. *See Pozzi*, 952 F.Supp. at 225; *Seidman v. American Mobile Sys.*, 965 F.Supp. 612, 622 (E.D.Pa. 1997). The Court of Appeals for the Ninth Circuit has recognized that it is appropriate to apply a benchmark percentage of recovery which "should be adjusted … when special circumstances indicate that the percentage of recovery would be either too small or too large…." *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990).

■ The court concludes, therefore, that it will award attorney fees based on the net settlement fund (gross settlement fund minus out-of-pocket litigation expenses).[15]

Class counsel have requested a fee of 30% of the settlement fund. While the plaintiffs have achieved a settlement in line with, and perhaps above, the expected value of the case should it go to trial, the court would not term the result achieved in this case as "extraordinary." Further, it does not appear that the case involved any complex or novel legal theories. In addition, while the court agrees

that adjustments may need to be made when very large common funds are created, *see J/H Real Estate*, 951 F.Supp. at 65, there is no need to implement a sliding scale in this case as the settlement fund is not so large as to create the impression that counsel is receiving a windfall. *See In re SmithKline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 534 (E.D.Pa.1990) (suggesting that the percentage of recovery should decline as the common fund becomes very large). Finally, the notice of the proposed settlement apprised the class members that an attorney fee not in excess of 33 1/3% would be requested and there were no objections. Thus, the court concludes that an attorney fee of 30% of the net settlement fund is reasonable.

As discussed below, the court has determined that the reasonable expenses in pursuing this litigation are $86,801.68. The court will award the attorney fee based on the gross settlement fund plus accrued interest as of January 23, 1997 ($1,164,897.50) minus expenses. This leaves a net settlement fund of $1,078,095.82. The court will award an attorney fee constituting 30% of this fund— $323,428.75.

Finally, the court will, "as a check … use the lodestar method to assure that the precise percentage awarded does not create an unreasonable hourly fee." *General Motors*, 55 F.3d at 822. Class counsel claim a lodestar of $369,242.50—approximately $45,000 more than the court is awarding under the

---

fund will reduce the attorney's recovery even further and possibly exacerbate these problems. The logical solution is to simply award a greater percentage of the net settlement fund than the court would otherwise award under the gross settlement fund. *See id.* at 690–98, 724–25 (noting that increasing the percentage of recovery can bring the incentives of class counsel closer in line with those of the class).

15. The court will not deduct the expenses of administering the common fund from the gross settlement fund in calculating the net settlement fund for two reasons.

First, the costs of administering the fund are an uncontrollable part of the litigation established by the framework of Rule 23 itself. Rule 23 requires that class members receive the "best notice practicable under the circumstances…." Fed.R.Civ.P. 23(c)(2). Adequate notice is also a requirement of Due Process. *See Phillips Petroleum*, 472 U.S. at 812, 105 S.Ct. at 2974–75. Thus, counsel should be encouraged to ensure

that class members receive adequate notice and that their clients, the class, are adequately apprised of the pendency and status of the litigation. This is also in the best interest of the class members. The court does not wish to create a disincentive to run the class efficiently.

Second, it would be extremely burdensome on the court to calculate an attorney fee if the costs of administering the class were to be deducted because a great deal of class administration expense is incurred after the court enters judgment on the adequacy of the settlement and attorney fees. For example, in this case the court would be unable to calculate attorney fees until all the claims of the settlement fund had been administered because I would not know the cost of administering the class until after the class members had been paid. Because such a system would overly tax the court's resources without any substantial beneficial incentive to class counsel, the court will simply exclude class administrative expenses when calculating the net settlement fund.

net POR method for computing attorney fees. As an initial matter, the court does not believe a deviation of approximately 12% between the fee as calculated under the lodestar method and the fee calculated under the net POR method does anything to undermine the court's confidence in the award as determined under the net POR method. Indeed, other courts are concerned with the lodestar method because it tends to encourage attorneys to exacerbate fees. *See id.* at 821. A recovery of 12% *less* than what would be awarded under the lodestar method is, therefore, perfectly reasonable.

Further, even if the court were concerned with an award under the net POR method which is somewhat lower than the attorney's lodestar, the court believes that the lodestar in this case is somewhat overstated. When evaluating a lodestar, the court must be cautious to ensure that class counsel does not engage in duplicative and repetitive work. *See Public Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1188 (3d Cir. 1995). The class in this case was represented by no less than six law firms with 24 individual attorneys from the firms participating. These six firms accumulated close to 1,000 hours of attorney time in partner hours alone, with rates ranging from $330 to a somewhat staggering $495 per hour. In such a situation, duplicative and repetitive legal work is almost inevitable unless someone exerts unusually strong control over the litigation.

Courts should be especially wary of situations where multiple counsel are brought into a case to handle certain discrete tasks or issues—especially a case which is not particularly complex such as the one at bar. It is no secret that the securities class action bar is a close knit group where a successful lawyer must learn to negotiate not only with defense counsel, but also with his fellow members of the class action bar. As one commentator has put it:

> What separates plebe from noble among class-action plaintiffs' lawyers is possession of the political skills to negotiate effectively with the opposing lawyers and, perhaps of greater importance, to work the sometimes Byzantine personal politics of the plaintiffs' class-action bar. In the relatively small world of plaintiffs' class-action lawyers, a familiar road to success is to parlay the small favors and back scratching of a series of class-action cases into a position of influence and sizable fees in a future class action of one's own.

Charles W. Wolfram, *Mass Torts—Messy Ethics,* 80 Cornell L.Rev. 1228, 1232 (1995); *see also In re Fine Paper Antitrust Litig.,* 98 F.R.D. 48, 68–78 (E.D.Pa.1983) (discussing the internal politics and patronage which occurred during the course of that litigation within the organizational structure of the various firms representing plaintiffs in that case), *aff'd in part and rev'd in part,* 751 F.2d 562, 601 (3d Cir.1984) ("We have found more in the trial court's opinion of which we wholeheartedly approve than we have found necessary to reverse."); John C. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working,* 42 Md. L.Rev. 215, 248–61 (1983) (discussing the political structure between plaintiff lawyers in complex litigation in general, and *Fine Paper* in particular). *But see Muehler v. Land O'Lakes, Inc.,* 617 F.Supp. 1370, 1375–81 (D.Minn. 1985) (Lord, J.) (criticizing the unfair portrayal of plaintiff class action lawyers as unethical or unscrupulous).

Without suggesting that counsel in this case have acted in any way improperly, it is enough to state that the incentives among plaintiff lawyers in the class action bar to maintain ties with their fellows in order to have a role in the next "big case" cannot be overlooked. Although it did not occur here, such incentives may sometimes lead to the inclusion of a plaintiff's firm in a case which may not be strictly necessary to pursue the goals of the case at hand.

Because of the number of lawyers involved, it appears that the lodestar figure in this case may be somewhat overstated because of the inclusion of duplicative legal work. This possibility is enough to satisfy the court that the attorney fee awarded under the net POR in this case is fairly in line with the services provided to the class. It is not necessary to determine with precision what an appropriate lodestar would be. In-

deed, one of the primary advantages of using the POR method is to avoid reviewing lodestar figures with a fine tooth comb. *See Task Force,* 108 F.R.D. at 246.

### B. Reimbursement for Litigation Expenses

██ Class counsel seek reimbursement for their out-of-pocket litigation expenses in pursuing this action totalling $91,265.29. There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of his *reasonable* litigation expenses from that fund. *See General Motors,* 55 F.3d at 820 n. 39. While the court believes that awarding an attorney fee based on the net settlement fund will tend to produce more reasonable expense reimbursement requests, the court is nevertheless required to review class counsel's requested expenses to ensure that they are reasonable. *See id.* at 819–20; *Pozzi,* 952 F.Supp. at 226.

First, the court believes that counsel should generally submit more detailed accountings of their expenses than were submitted in this case. *See id.* at 226–27 (disapproving of the lack of documentation to support the plaintiff's expense requests). It is difficult enough for a court to determine whether expenses requested are reasonable with thorough documentation. The court's task is made considerably more difficult given the dearth of information provided in this case. Ideally, expense petitions should contain not just the total expense requested for a particular service, but also a breakdown of the price per unit of the service and the number of units consumed, especially when those services are provided in-house.[16] Because plaintiff bears the burden of proving his fees are reasonable, *see Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir.1990); *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 886 F.Supp. 445, 468 (E.D.Pa. 1995), to the extent that plaintiff's request for expenses appear unreasonable on their face, the court will err on the side of reducing the sum.

### 1. *Secretarial Overtime*

██ Class counsel seek to recover $911.03 in costs for secretarial and word processing overtime. This court agrees with Judge Bartle's conclusion that "[t]he class members should not suffer because counsel have elected to have some clerical work completed after normal business hours." *J/H Real Estate,* 951 F.Supp. at 66. That request will be rejected.

### 2. *Computerized Research*

██ The Third Circuit has approved the awarding of expenses for time spent on computerized research such as WESTLAW and LEXIS *so long as those sums are reasonable. See Wehr,* 619 F.2d at 285 (computerized research recoverable if reasonable); *Pozzi,* 952 F.Supp. at 226–27 (accord). Lead counsel, Milberg Weiss seeks $7,552.58 in expenses for computerized research. This seems quite high. Nowhere in Milberg Weiss' fee petition did it explain what particular activities were done on-line as opposed to what could have been done through traditional research techniques. While computerized research is certainly an invaluable tool which often saves considerable money over traditional research technique, it is not always the most efficient method of research and in the hands of an inexperienced user (or one who has little incentive to keep costs low) can be quite wasteful.

Because plaintiffs have failed to meet their burden of justifying such a large expense on computerized research, the court will not allow the full expense requested. The court finds that $4,000 is a reasonable expense. *See Pozzi,* 952 F.Supp. at 226–27 (because counsel did not document its on-line research, court could not conclude that request for $7,831,10 was reasonable and instead awarded plaintiff $4,000).

### 3. *Duplication Expenses*

██ The court originally questioned the plaintiffs' request for over $16,000 in duplication expenses. Upon request, counsel have submitted to the court a more detailed report

---

**16.** Under the net recovery system the court can be more confident that the quantity of any given expense will be reasonable. The court should be very careful, however, to guard against attempts to increase the price charged for the service in order to recoup any losses which might flow from the use of the net recovery system over the gross.

of their photocopying expenses. Milberg Weiss, Spector & Roseman, and the law offices of Bernard M. Gross have certified to the court that the price charged per page was in no case greater than $.25 per page. The court finds this to be a reasonable price. *Cf. J/H Real Estate Inc. v. Abramson*, 951 F.Supp. 63, 65 (E.D.Pa.1997) (Bartle, J.) (on reconsideration finding photocopy fees were reasonable).

The court still has no documentation to determine whether the number of copies was reasonable. Under a net recovery system, the court would feel rather confident that, so long as the price charged per copy was correct, the number of copies made would also be reasonable. However, the court has no reason to believe that is so in this case. Nevertheless, after consideration of the documentation submitted by counsel, the court believes the expense is within the range of reasonableness and it will be approved.

#### 4. *Remaining Expenses*

The court believes that the remaining expenses requested by counsel are in the range of reasonableness and they will be approved. Thus, the court will award class counsel $86,801.68 in out-of-pocket expenses.

#### C. Incentive Fee to Named Class Representatives

 Finally, class counsel seek three $1,000 disbursements from the common fund to be paid to each of the three named class representatives in this case. Plaintiffs argue that the representatives are entitled to the fee because they have, through their efforts as named representatives, conferred a substantial benefit on the class. *See* N.T. Jan. 24, 1997 at 53–54.

The named representatives in this case did put forth some effort in pursuit of the class. *See id.* (noting that named plaintiffs prepared affidavits, retained experienced counsel, were willing to vigorously prosecute the case, and were willing to attend court sessions and respond to discovery requests by defendants). Although the bulk of time in this case was spent by the lawyers, rather than the class representatives, and the actual effort put forth by these parties was not particularly significant, there is sufficient precedent in this district to support such an award, *see Pozzi*, 952 F.Supp. at 227–28; *J/H Real Estate*, 951 F.Supp. at 66; *SmithKline*, 751 F.Supp. at 535, and the court will therefore approve the distribution of $1,000 per representative.[17]

* * *

In summary, the court finds that the proposed settlement of $1.15 million is fair, adequate and reasonable and it will be approved. The court has concluded that the most appropriate method of calculating attorney fees in a common fund class action such as this is to award fees based on a percentage of the net settlement fund. The court will award class counsel a fee of 30% of the net settlement fund—the gross settlement fund minus reasonable expenses—totaling $323,428.75. The court will also reimburse class counsel for their reasonable expenses out of the common fund totalling $86,801.68. Class counsel's request for a $1,000 payment to each of the class representatives will also be approved. An appropriate order follows.

### *ORDER*

AND NOW, this 2nd day of April, 1997, after consideration of the plaintiffs' memorandum of law in support of the settlement of this class action and the exhibits attached thereto, the plaintiffs' application for an award of attorney fees and expenses and the exhibits attached thereto, the affidavits of Stephen Schulman, Esq., and the testimony presented at the hearing held in this matter on January 24, 1997, for the reasons stated in the memorandum attached to this order IT IS HEREBY ORDERED as follows:

1. The Class, as defined in the Settlement Agreement, consists of all purchasers of National Media common stock during the period April 25, 1994 through July 15, 1994, inclusive, (excluding all defendants herein and any firm, trust, corporation or entity controlled by or affiliated with any of the defendants),

---

**17.** Such awards are not permitted for securities class actions filed after the effective date of the Private Securities Litigation Reform Act of 1995, Pub.L. 104–67, 109 Stat. 737 (1995). *See Pozzi*, 952 F.Supp. at 227 n. 8.

as well as their legal representatives, heirs, predecessors or successors in interest or assigns (the "Class").

2. For purposes of this Final Judgment, the Court adopts and incorporates the definitions in the Settlement Agreement.

3. This Court has jurisdiction of the subject matter of this litigation, of all actions within this litigation, and over all parties to this litigation, including all Class Members. No objections or requests to opt-out having been received, this order is binding on all class members as defined in paragraph 1 of this order.

4. The proposed Settlement as set forth in the Settlement Agreement, consisting of $1.15 million plus accrued interest, is hereby approved as fair, reasonable and adequate.

5. The Court hereby decrees that neither the Settlement, nor this Final Judgment, nor the fact of settlement constitute an admission or concession by any Defendant of any liability or wrongdoing whatsoever. The Final Judgment is not a finding of the validity or invalidity of any claim asserted in the Action, or of any wrongdoing by any Defendant. Neither the Settlement, nor this Final Judgment, nor the settlement negotiations, nor the settlement proceedings, nor the fact of settlement, nor any documents related to the Settlement shall be used or construed as an admission of any fault, liability, or wrongdoing by any person or entity, or shall be offered or received in evidence as an admission, concession, presumption or inference against any party in any proceeding other than such proceedings as may be necessary to consummate or enforce the Settlement.

6. This action is hereby dismissed in accordance with the terms of the Settlement Agreement, without costs (except as provided in the Settlement Agreement), and upon the merits and with prejudice and in full and final discharge of any and all claims the Named Plaintiffs, for themselves and all Class Members and their respective heirs, executors, administrators, representatives, successors, assigns and agents.

7. The Released Parties are hereby released from the Released Claims, as defined in the Settlement Agreement. "Released Claims" means and includes any and all claims, actions, causes of action, rights and liabilities whatsoever, whether based on any federal, state or foreign law, foreseen or unforeseen, mature or unmatured, known or unknown, accrued or not accrued, against National Media or the individual defendants or any of its or their present or former members, officers, partners, directors, trustees, employees, agents, servants, investment bankers, advisers, attorneys, stockholders, heirs, executors, administrators, representatives, successors, assigns, subsidiaries, affiliates, parents, divisions, predecessors, insurers or reinsurers (collectively the "Released Parties"), that are alleged or that could have been alleged in the Action.

Notwithstanding the foregoing, the term "Released Claims," as used in this Settlement Agreement, does not include (a) any claims, causes of action, allegations or rights, whether now known or hereafter discovered, presently asserted or hereafter asserted by amendment or otherwise, by any of the plaintiffs in the Delaware Action (the "Delaware Action Claims") or in the action entitled *In re ValueVision International Inc. Securities Litigation,* Master File No. 94–CV–2838 (E.D.Pa.) (the "ValueVision Action"), individually, directly or representatively on behalf of one or more classes or purchasers of securities of National Media (the "ValueVision Action Claims") or (b) any claims for indemnification or contribution between or among any of the Released Parties as defined in the foregoing paragraph by reason of, based upon, or arising out of or in connection with any matter presently or hereafter asserted in the Delaware Action or in the ValueVision Action ("Indemnification/Contribution Claims"). Without limitation of the foregoing, the Settlement and all findings of fact, conclusions of law, opinions, decisions, orders and all other proceedings in this Action shall not operate as the basis for any assertion of res judicata, collateral estoppel, claim preclusion, issue preclusion, release, bar, merger or the like as against the maintenance and prosecution of any Delaware Action Claims, ValueVision Action Claims, or Indemnification/Contribution Claims, nor shall this Settlement nor any

findings of fact, conclusions of law, opinions, decisions, orders and all other proceedings in this Action affect the admissibility of evidence or discovery of information relating to such Delaware Action Claims, ValueVision Action Claims, or Indemnification/Contribution Claims; nor shall this Settlement nor any findings of fact, conclusions of law, decisions, orders and all other proceedings in this Action be admissible in evidence or cited as authority in connection with any proceedings relating to or arising from such Delaware Action Claims, ValueVision Action Claims, Indemnification/Contribution Claims.

8. It is expressly determined, within the meaning of Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay and the entry of this judgment is hereby expressly directed.

9. Without affecting the finality of this judgment in any way, this Court retains continuing jurisdiction: (a) over the implementation of this Settlement and any distribution to Settling Plaintiffs made pursuant to further orders of this Court; (b) over disposition of the Settlement Fund; (c) over the action until the final judgment contemplated hereby has become effective, and each and every act agreed to be performed by the parties shall have been performed pursuant to the Settlement; and (d) over all parties to the action for the purpose of enforcing and administering the Settlement.

10. Named Plaintiffs are hereby awarded the amount of $1,000 each, as compensation for their services as class representatives, to be paid out of the gross settlement fund.

11. Plaintiffs' Counsel in the action are hereby awarded attorneys' fees in the amount of $323,428.75 and reimbursement of expenses in the amount of $86,801.68, to be paid in accordance with the Settlement Agreement.